JOHN T. HOWARD ET AL., APPELLANTS, VS. THE PENSACOLA AND ATLANTIC RAILROAD COMPANY, APPELLEE.

1. If a complainant amends his bill so as to materially change its character after a plea to it has been adjudged sufficient, he cannot on an appeal taken from a final decree rendered upon the case made by the amended bill, plea and answer and replication thereto and testimony, assign as error the ruling upon the plea to the original bill.

2. A material amendment of a bill, after a decree *pro confesso* for default in pleading has been opened, is a waiver by the complainant of his right to assign as error on appeal the opening of such decree.

3. Charges of fraud or mistake must be specific, and to avail anything they must be proved if denied.

4. Where a contract is embodied in several instruments, its true meaning is to be ascertained from a consideration of all the instruments and their effect upon each other.

5. Although the parties to a written contract may by the adoption and pursuit of a course of dealing inconsistent with a provision of the contract, substitute the terms of their dealing for the particular pro-

vision of the contract, yet they will not be held to have intended, nor be bound by, such substitution, when it appears that upon discovering that they had through mistake of both parties been acting contrary to the agreement as written, they abandoned such course of dealing and conformed to the terms of the written contract, and the conduct of the party against whom it is sought to recover upon the basis of such departure from the contract has shown, from the time of the discovery of the mistake, a positive determination to insist upon and adhere to the contract as written.

6. Where differences between the parties to a contract have been referred by them to a third person, and afterwards a settlement has been agreed to by the contracting parties upon the basis of the referee's adjustment, and such settlement has been partly performed by the payment of sums in accordance with and in liquidation of such agreement of settlement, the party receiving the payments will, in the absence of any fraudulent or unfair dealing by the other party to the contract or by such referee, and of any mistake upon the part of such referee, be held to the settlement agreed upon by them.

7. The parties to a contract may submit their differences to an employee of one of them for arbitration or adjustment and agree that his decision shall be final as between them.

8. A provision by which a party, who is to perform a specified work for another, agrees that he will not execute any extra work, nor make any modifications or alterations in the work described in the specification and plans, unless ordered in writing by a named agent of the party for whom the work is to be done, nor claim pay for extra work, modifications or alterations, unless such written order be produced, is valid.

9. Where a person has contracted to do work for another, and has assigned the contract and whatever may be payable to him thereunder for the performance of the work, to a third person as collateral security for moneys advanced and to be advanced by such third person to enable the assignee to perform his contract, and after such assignment the parties to the original contract have adjusted their differences as to the amount payable under the contract, the fact of such assignment will not avoid such adjustment either in favor of the assignor or of the assignee in a suit in equity instituted by them against the other party to the contract, the amount fixed by the adjustment exceeding that due the assignee

37

by the assignor. What would be the rule if the amount as adjusted was less than that due the assignee, not decided.

Appeal from the Circuit Court for Gadsden county.

Judge Broome, of the Seventh Circuit, sat in the place of Chief-Justice Maxwell, who was disqualified.

On July 25, 1881, John T. Howard (one of the appellants) and John C. Walker entered into a written agreement with the Pensacola and Atlantic Railroad Company, of which agreement the following are provisions material to the case under consideration :

1. Howard & Walker agreed to execute, perform and complete in a skillful, substantial and workman-like manner, with all requisite labor, tools and machinery, and with proper and sufficient materials, the gradation, trestling and delivering of the cross-ties on the section of the appellee's line of railroad between the Chattahoochee and Chipola rivers, a distance of about twenty-five miles, according to the specifications, profiles, maps, plans and drawings exhibited by the engineer of the railroad, at his office in Pensacola, at a letting duly advertised for the same in the Pensacola and other newspapers, or by "blue copies," said specifications, profiles, maps, plans and drawings to be implied or reasonably inferred therefrom, and to abide by, perform, follow and fulfill all the stipulations, regulations and directions in said specifications set forth. The "said labor, tools, engines, machinery, materials to be furnished and the said work to be done to the satisfaction of the engineer in charge, or Vice-President for the time being of said company, according to the said specifications, profiles or blue copies, and according to the general plan of the superstructure, and such working plans and detail drawings as shall be furnished by the company, the same to be

approved by the engineer in charge for the time being."

2. Howard & Walker " agree that they will not execute any extra work, nor make any modifications or alterations in the work mentioned in said specifications and plans; unless ordered *in writing* by the said engineer in charge, nor will they claim payment for the same unless such *written order be produced.*"

3. It is " further agreed that the said engineer in charge shall have the right from time to time to direct or order *in writing* any modifications or alterations to be made in said specifications, profiles, maps, plans, drawings, blue copies, etc., etc., and in portions of the materials or work in the said specifications mentioned, and in *like manner* to direct and order the omission altogether of any portion or portions of the work in said specifications mentioned, or to substitute any other work or works for, or in place of, said portions, and that such alterations, omissions and substitutions may be so directed and ordered to be carried out by the said engineer in respect to any portion of the work in said specifications, maps, plans, drawings, blue copies, etc., but the same or any extra work which shall be directed to be done shall not vitiate nor determine this contract, but, on the contrary, the same shall remain in full force, subject only to this proviso: that the value and amounts of all such omissions as aforesaid shall be deducted from the amount which would otherwise be due under this contract, and that the value and amount of all such other modifications, alterations, substitutions, extra or added work shall be either deducted from, allowed for or added to the amount which would otherwise be due under this contract, according to the particular nature and description thereof; the said engineer in charge or Vice-President for the time being to ascertain, determine and fix such respective value and amounts, and whether the same

shall be deducted from, allowed for or added to the amount to be paid under this contract."

4. The railroad company, " in consideration of the full and complete performance of said work to the entire satisfaction of said Vice-President or engineer in charge for the time being, to be evidenced by his certificate, agrees to pay to " Howard & Walker " the prices set forth in the schedule to the proposal of " Howard & Walker, " a copy of which, *together with 'blue copy' and specifications, is annexed to and made part of said general specifications hereto annexed,* and of this contract at the time and in the manner following: Upon the execution of portions of the work to the satisfaction of said engineer in charge for the time being, eighty per cent. of his monthly estimate of the relative value of the work performed, including materials furnished at the site of the structure, to the first day of each month, shall be paid on or before the 15th day of the same month ; said payments to be made at the office of the said railroad company in Pensacola. The balance shown by the engineer's certificate to be due on this contract shall be paid at the railroad company's office in Pensacola on the completion of the entire work, and upon the production of the certificate aforesaid showing said balance."

5. " Finally it is agreed that if any dispute or misunderstanding shall arise between the parties as to the meaning or execution of the provisions of this contract, or any matters not covered by this contract, it shall be referred to a referee, and his decision shall be final as between the parties hereto and as binding as if specially described herein." The " proposal " and the " specifications " mentioned in the 4th paragraph above will be set out to the extent necessary, hereafter.

On the 21st day of May, 1884, Howard (who had survived Walker) and George and Edward Lewis, partners

JUNE TERM, 1888.     565

John T. Howard et al. v. P. & A. R. R. Co.—Statement of Case.

under the style of B. C. Lewis & Sons, filed a bill in equity against the railroad company alleging the making of the contract.

The allegations as to the prices under the 4th paragraph is that the company agreed to pay the prices " set forth in the schedule to the proposals" of the said Howard & Walker, " that is to say, 30 cents per cubic yard for loose earth excavation," (and other prices not necessary to mention here,) and the paragraph in question is set out substantially as stated above, except that nothing is said as to the italicised provision of said paragraph as to blue copy and specifications.

The bill also alleges that Walker died on November 10th, 1881, and that on the 25th day of that month, Howard, in order to enable him the better to carry out and complete the work, obtained from B. C. Lewis & Sons " a loan of five thousand dollars in cash," and to secure them the payment of the " sum so loaned or to be advanced," assigned and transferred to them " all that sum or sums of money which were then due, owing or coming to him, as surviving contractor on any monthly estimate theretofore made of moneys due and payable for work done and performed and for materials furnished " by Howard & Walker, or by Howard, survivor since the death of Walker, under said contract, and all future sum or sums of money which might thereafter be due, owing and coming to him on any future estimate which might thereafter be made for work and materials then done or furnished, or thereafter to be done or furnished, under said contract, and every right, interest and demand of Howard, as surviving contractor, in and to all sums of money and every part thereof which, under the provisions of said contract, might thereafter be reserved and were to be paid on the completion of the entire work; appointing them his attorneys in fact, in his name to de-

mand, sue for and receive the said sums of money; and having a proviso that if Howard should pay them the said sum of $5,000, " and all future sums which might be thereafter advanced to him by the said B. C. Lewis & Sons, with all interest which might become and be due thereon, then the said assignment should be void." This assignment, the bill alleges, " is in writing and in the custody and control of the " appellee.

The bill further alleges that on or about September 7th, 1883, he fully and completely performed said work to the entire satisfaction of the said engineer in charge, and in accordance with the contract, but the railroad company has failed and refused to pay complainants or either of them, at the time and in the manner mentioned in said contract, the prices therein specified.   That the amounts for work and labor done and materials furnished under said contract by Howard & Walker, and Howard, survivor, at the prices mentioned therein are as follows:

| | |
|---|---:|
| For excavation............................................ | $124,777 25 |
| For timbers in foundations, piles, open drains and trestling, etc.................... ..................... | 31,833 45 |
| For cross-ties............................................. | 19,412 50 |
| For iron................................................. | 3,141 70 |
| For other services and material........................... | 7,282 95 |
| Aggregating...................................... | $186,448 45 |

That the company has reduced the said amounts by payment to Howard & Walker, in the lifetime of the latter, and to complainants since his death, but has failed and refused to pay to complainants, or either of them, the whole of said amount of money at the time and in the manner provided in said agreement, and there is now due and owing to " Howard, as surviving contractor aforesaid, for and on account of labor on said railroad," $31,639 43-100,

which is a lien on said railroad of prior dignity to all other liens under the laws of Florida.

That Howard has never paid in full the sums of money which were advanced and loaned to him as aforesaid by B. C. Lewis & Sons, but a portion of said advance or loans is still due and owing to them, and the said assignment still remains a legal and valid security therefor. That the amount which is so due them is much less than the amount due Howard, and the default and refusal of the company to pay the latter has hindered, delayed and prevented him in the payment of B. C. Lewis & Sons.

The prayer of the bill is for an account and for a decree that the amount found to be due to Howard be paid to complainants or either of them, by a short day to be named, and in default of payment that the railroad, or so much thereof as Howard has a lien on, may be sold and the proceeds applied to the amount found to be due, with interest and costs, and for general relief and process.

The railroad company interposed a plea to this bill, and on a hearing upon the same, it was held to be a sufficient plea, and thereupon the complainants, having retained leave, amended their bill. As the same plea was, after the amendments, pleaded again, with the support of an answer, it is not necessary to set it out until we reach the answer.

The amendments are as follows:

(a) That Howard, as surviving contractor, on or about —— day of April, 1883, fully and completely performed said work in accordance with the contract, " to the entire satisfaction of defendant's Chief Engineer, who prepared and furnished to Howard a final statement or estimate of said work, bearing date the 5th day of April, 1883, a copy of which is attached as a part of this bill." That afterwards the defendant, through its Vice-President, W. D.

Chipley, informed Howard, by a letter dated the 16th of said month, that the trestle work was bad and that it had been decided to require Howard to put the same in proper shape before paying the balance which was due and owing to him for and on account of said work. It then alleges the making of the agreement of April 24th, 1883, and makes a copy of the same a part of the bill.

(b) That the said agreement of April 24, 1883, was entered into "for the sole purpose of adjusting and settling differences that had arisen between them touching the completion of the entire work, and in accordance with said contract of July 25, 1881, as will fully appear in the preamble thereto, and to protect the defendant against certain suits then pending against it, and was never intended as a statement of accounts between Howard and defendant." That at the time of making this agreement Howard had not had any opportunity of examining the statement or final estimate aforesaid, bearing date April 5th, 1883, which was furnished to him by defendant's engineer, but he has since examined the same and found it to be incorrect, false and fraudulent, and totally at variance with the previous estimates of the defendant's Chief Engineer, which were heretofore made monthly and accepted by him, and made the basis of his previous settlements with the defendant, and also with Howard's sub-contractors.

(c) That defendant's Chief Engineer has, through mistake or fraud, allowed Howard in said final estimate for total excavations and haul the sum of $113,164 29-100 only, when he should have allowed him the sum of $123,-277 85-100, making an error of $10,113 56-100, as will appear by the previous estimates of the defendant's Chief Engineer.

He has failed to allow and include therein (1st) $1,500 for 5,000 cubic yards of earth on section 17 of said railroad,

which work was done at the request of the defendant; this being additional work and necessitated by a change on 36 stations, each under the direction of the defendant's engineer; and (2) has, through mistake or fraud, allowed to Howard in said final estimate for cross-ties the sum of $17,093 23-100, when he should have allowed him the sum of $19,412 50-100, making an error of $2,319 25-100; and (3) has omitted and failed to allow in said final estimate the sum of $7,282 95-100 for other materials and work and labor for which the defendant is indebted to Howard.

(d) That at the time of making the agreement of April 24, 1883, the defendant admitted the said final estimate did not show the true and correct balance of money that was due to Howard under the contract of July 25, 1881, and then acknowledged itself to be indebted to Howard, under the last named contract, in the sum of $43,634.05, or $9,152.29 more than the balance shown by said final estimate, but in fact defendant was then indebted to him in a much larger sum.

That the differences between Howard and defendant touching the completion of the said work, that induced the making of the agreement of April 24, 1883, were referred to Geo. B. Pickett and decided by him, and both parties acquiesced in his decision. That Howard has long since performed such work as was required of him by the terms of the decision, yet defendant has persistently refused to make and state any account with Howard in accordance with the contract of July, 1881, and to pay to him the balance that is due to him for the work aforesaid, but has offered to pay to him a smaller sum of money than is really due to him, on condition that he will release and acquit defendant from all liability for the actual amount due, which offer Howard refused and still refuses to accept.

The agreement of April 24th, 1883, between the railroad

company and Howard, referred to in the above amendment as exhibit B, and expressly made a part of the bill, " witnesseth, that whereas the Pensacola and Atlantic Railroad Company, on the 25th of July, 1881, in contract with John T. Howard and John C. Walker, as co-partners for the performance of certain work on said railroad, as set forth in said contract and specifications thereto attached ; and whereas, the engineers of the railroad company report that said work is not completed according to the contract of July 25, 1881. Now, therefore, the said railroad company, in consideration of the agreements hereinafter contained, to be done and performed by Howard, survivor, &c., agree to pay to Howard, upon being relieved of all suits, garnishment or other, on account of said firm, the balance due said Howard & Walker, or Howard, survivor, as shown upon *final* given said Howard by Engineer Davies, April 5th, 1883, except the sum of $10,000 and such amounts as will cover such suits as said Howard cannot get satisfied at once.

" And it is further understood and agreed that the said sum of $10,000 shall be held by said company as a guaranty for the faithful performance of such work as the engineers of the railroad company shall determine the said Howard shall do at once to complete said contract of July 25, 1881. And Howard agrees to commence said work within seven days from the date hereof, under the direction of such engineers as the railroad company shall send with him, and shall finish the work with reasonable dispatch ; and it is further agreed that should not Howard commence said work as herein agreed and finish the same within a reasonable time, then the railroad company have the right to complete said work at his expense.

" It is further agreed that should any dispute arise between the parties hereto as to whether the present condi-

tion of any portion of the work is due to the use of the road by the railroad company or by improper construction of trestles by Howard, the same shall be referred to Geo. B. Pickett, whose decision shall be final as to both parties, and in the event Pickett shall be unable to act, the parties hereto shall agree upon some other engineer as referee, whose decision shall be final as to both parties.

"It is further agreed that upon the completion of said work to the satisfaction of said company, to be evidenced by the certificate of the engineer, the railroad company will pay to Howard the $10,000 retained, and as rapidly as any suits are determined will pay to him, or to whom the court directs, such sums as may be retained as security for such company against such suit.

"And it is further agreed that these sums shall be full and complete satisfaction for all claims of Howard & Walker, and Howard, survivor of said firm, under said contract of July 25, 1881, except an unsettled account for iron and timber ordered by A. W. Gloster, now at Apalachicola river, and to be measured and weighed before being paid for."

After this amendment of the bill the railroad company filed a plea and an answer in support thereof, to the following effect:

The plea is to the account and discovery sought by the bill, of and concerning the dealings and transactions therein alleged to have taken place between defendant and Howard & Walker, before the death of the latter, and with Howard since Walker's death, under the contract set forth in the bill, and to the relief therein sought, except as to $11,246 55-100, admitted to be due; and alleges:

That prior to April 24, 1883, disputes had arisen between it and Howard, who then alleged that he had completed the work on the railroad of defendant, which he

and Walker had contracted to do, said disputes being whether the work had been done by H. & W. and H. in accordance with said contract, and as to the amount due by defendant to Howard, survivor, and that in order to finally settle said disputes and the amount due, the said Howard, as surviving partner, and defendant entered into the above agreement of April 24, 1883, a copy of which is annexed to and made part of this plea.

That the referee provided for in said agreement was chosen and made his award, which was complied with by the defendans and Howard.

That the amount of the final estimate of C. A. Davies, Chief Engineer, mentioned in said agreement, was $33,481 76-100, and defendant has paid to Howard, or his order, $21,526 76-100, and has tendered to him, viz: on September 22d, 1883, the balance thereof, together with $333 55-100, the amount of the unsettled account for iron and timber mentioned in said agreement, less $992 due to defendant for 1,550 sawed ties furnished by defendants to Howard, and less $50 paid by defendant to the said referee as Howard's proportion of the referee's fee; that is to say, the defendant on said day tendered to Howard $11,246 55-100, (and $500 "more in order to effect a settlement,") which sum defendant alleges was in full and complete compliance with said contract of April 24, 1883, and was all that ever was and is due under the original contract or otherwise of July 25, 1881, from defendant to Howard & Walker, or Howard, survivor.

For answer to the bill, but "in support of the foregoing plea, and not waiving the same," the defendant says:

It is a corporation under the laws of Florida, and made the contract of July 25th, 1881.

There is here annexed to the bill a copy of this contract, and also a copy of the "proposal" of Howard & Walker

and of the " general specifications " as part of the bill.

The proposal, dated July 15th, 1881, is signed by John T. Howard and J. C. Walker, and certifies that he has personally and carefully examined the sections numbered ——, on division ——, of the Pensacola and Atlantic Railroad, also that he has carefully examined profiles and specifications of the same, and having made such examination, the undersigned hereby proposes to the said railroad company to do all the work specified on the sections aforesaid according to the conditions and specifications aforesaid, and on the acceptance of the proposal do hereby bind —— to enter into and execute a contract for all said work at the following prices:

Then follow the prices:

Earth excavation, per cubic yard...............................$  30
Loose rock excavation, per cubic yard.........................  40
Solid rock excavation, per cubic yard.........................  50
Timber in foundation, per 1,000 feet, B. M................... 25 00
Iron in foundation, per pound.................................  10
Piles per lineal foot, common.................................  25
Open draws, timber per *M.*, B. M............................. 25 00
Trestling per *M.* feet, B. M................................. 25 00
Cross-ties, per tie...........................................  25

The " general specifications " provide, under the head of " graduation " and sub-head of " excavations," for the classifications of excavations into " earth," " loose rock," " solid rock " and " excavations in water," and defines what each will include, and after doing so, states:

" The prices for excavations include all bottoming, road crossing, alteration of roads and water channels and ditches, also construction of temporary roads.

" If average distance hauled exceeds 300 feet the contractor will be entitled to additional compensation of one cent per cubic yard, per hundred feet, for such excess.

" On sections where the excavations exceed the embankment the excess shall be deposited at such points as the engineer may direct. * * * * * * *

" Materials found in excavations, applicable to useful purposes, such as building stone, gravel stone suitable for ballast, and minerals, shall be laid aside for use in such places as the engineer may direct, to be applied then or subsequently to the construction of the road, under the conditions and specifications of this contract.

" Materials moved by the contractor will be measured by the engineer only in the excavation, and paid for accordingly. It will be disposed of according to the engineer's direction, and additional payment will not be allowed for putting it into the embankments."

The last clause of the specification is as follows:

" The word engineer shall mean the engineer in charge, unless otherwise expressed."

The answer then alleges that A. W. Gloster was the engineer of defendant in charge of the railroad covered by said contract, from the beginning of the work thereunder until November 1st, 1882, when Colin A. Davies became such engineer in charge, and continued to be such until the completion of the work covered by the contract.

That Gloster, as such engineer in charge, furnished to defendant monthly estimates of the work done by Howard & Walker, in Walker's lifetime, and by Howard afterwards, until —— July, 1882, when he became sick and was absent thereafter, but was represented by said Davies as assistant engineer, until November, 1882, when he was superseded by Davies as aforesaid, copies of which estimates and of all of them are annexed as part of this answer.

That defendant made payment to Howard & W., and after said death, to Howard, on the same.

That the number of cubic yards of excavations and the value thereof shown upon said estimates are also shown upon the copies thereof annexed hereto, and are computable therefrom.

That the monthly estimates made by Gloster prior to February, 1882, were not in accordance with the contract, but those made by him afterwards and those made by Davies were in accordance with it.

That Gloster discovered at the date aforesaid an error in making the monthly estimates prior to that time, and in the method of ascertaining the number of yards of excavation for which Howard & Walker, and Howard, survivor, were entitled to be paid under the contract, and afterwards he made the estimates correctly and in accordance with the contract; defendant avers that the said estimates made before February, 1882, were incorrect, and not in accordance with the contract, but that those made thereafter, either by the said Gloster or the said Davies, were correct and in accordance with said contract.

That up to February, 1882, when Gloster discovered the previous mistake as aforesaid, the defendant paid H. & W., and to Howard, after said death, eighty per cent. of said monthly estimates, at the times and in the manner indicated in said contract, but when such discovery was made it was also discovered that in consequence thereof H. & W. had been paid for work on certain miles of railroad sums largely in excess of those to which they were entitled on said miles, and that therefore they were largely indebted to defendant on said miles, and defendant did not pay to Howard & Walker, or, after W.'s death, to Howard, anything on account of said miles until said indebtedness to defendant on account of said miles had been cancelled; and that the indebtedness on account of some of said miles has never been cancelled, although upon a general account be-

tween Howard and defendant, including all the work under said contract, defendant is indebted as hereinafter alleged.

That Howard has completed the said work to the satisfaction of the engineer in charge, except that portion covered by the decision of the referee, and as to this defendant is per force satisfied, and defendant has paid Howard all the sums due him for labor on said railroad, or due on account of said contract, except $11,246 55-100, which it still owes, and tendered to Howard before the commencement of this suit, but he refused to accept the same.

That "the statement of account and agreement of April 24, 1883, was made and entered into by Howard and defendant after a full discussion of all the differences between them relative to the amounts due by defendant to him, and especially of the difference between them as to the amount of excavation for which he is entitled to be paid, and that the said statement and agreement was not intended to cover only the question which was referred to the referee, but also all matters of difference between them, and as a statement of all accounts between them.

That it is not true that defendant ever was indebted to H. & W., or to H., in the sum stated in the bill for excavations, for timbers in foundations, open draws, piles and timbers, cross-ties, iron, and other services and materials, aggregating $186,448 80-100, as alleged, nor to any extent greater than shown by the final statement of Davies, a copy of which is annexed to the amendments to the bill, except as to the account for iron and timber.

There is a denial that such final estimate was or is false, fraudulent or inaccurate, as alleged in the bill, and an averment that the same is true, fair and correct in every particular.

There is also a denial that Howard did not have time to

examine the final estimate between its rendition and the making of the agreement of April 24, 1883, and an averment that defendant is not informed whether he had the opportunity to do so or not, but that whether he had done so or not he knew the contents thereof, and that it disallowed the claim he now makes in his bill, and which he has frequently made theretofore, and that he knew that by said agreement he was settling and adjusting all of said claims and differences.

There is also a denial that defendant admitted at the time of making the agreement of April 24, 1883, or at any other time, that it was indebted to Howard in the sum of $9,152.29 or any other sum, except as set forth in the contract of April 24, over and above the amount shown by the final estimate.

To this plea and answer the plaintiff filed a replication in usual form.

Before proceeding to a hearing in the Circuit Court upon the pleadings and the testimony taken thereunder, the following agreement was made in writing by counsel for complainants and defendant :

"It is agreed that the hearing now to be had in this cause shall be a final hearing, and that thereupon a final decree shall be entered, subject, of course, to appeal by either party.

"It is further agreed that in the consideration of the cause the court shall determine (1) whether the final estimates of defendant's Chief Engineer and the agreement between Howard & Walker and defendant can be impeached and shown to be erroneous, and as to whether the defendants are estopped from revising the estimates made and furnished plaintiffs and acted upon by him in settling with his sub-contractors; and (2) if so, to what extent, and

(3) if so, to what extent upon the pleadings and evidence they have been so impeached or proven erroneous; (4) and shall, after such determination, proceed to decree to the complainants such amounts as, under the pleadings and evidence, they have shown should have been omitted from the said final estimate and the said agreement, or to be due to them outside of the matters embraced in said estimate and agreement.

"This agreement is without prejudice to the rights of either party as to any questions not mentioned herein that may arise upon the pleadings and proofs."

A final decree was rendered February 10th, 1887, and is to the effect that the complainants recover of the defendant $17,983 and costs, and that he has a lien on the railroad from River Junction, in Gadsden county, to Pensacola, in Escambia county, and that defendant pay the sum adjudged within ten days, and that in default thereof a sale of the property be made to satisfy the decree.

*John W. Malone* for Appellants.

*W. A. Blount* for Appellee.

MR. JUSTICE RANEY delivered the opinion of the court:

I. The complainants, having amended their bill in the manner shown by the record, after the ruling of the Chancellor holding the plea to be sufficient, and the defendant having pleaded to the bill as amended and filed an answer in support thereof, it is not necessary for us to pass upon such ruling, nor would it serve any beneficial purpose in so far as this litigation is concerned. The case as made by the bill and plea prior to the amendment was abandoned by making the amendment. By amending the complainants have waived the right to insist upon our reviewing

the ruling in question, and can only claim that we shall dispose of the case made by the bill as amended and the pleadings filed subsequent to such amendment, and the testimony. The effect of the amendment is also to remove from the case, as a practical issue, the question of the propriety of the previous order setting aside the decree *pro confesso* entered on the original bill. 1st Daniell's Chan. P. & P., 425, 524; Weightman vs. Powell, 2 DeG. & S., 570; 12 Jurist, 958; Jopling vs. Stewart, 4 Vesey, 619; Trust and F. I. Co. vs. Jenkins, 8 Paige, 593; Circuit Court Chancery Rule 52, 59.

The agreement of counsel for a " final hearing," and that a " final decree" should be entered, is entirely consistent with the above views.

II. Under the agreement of counsel just referred to, we are to consider and dispose of the case made by the bill as amended, the subsequent pleadings and the evidence, and pass upon the correctness of the decree appealed from.

By referring to the original contract of July 24th, 1881, in the statement of the case, it will be seen that upon the complete performance of the work to the entire satisfaction of the engineer in charge, the same to be evidenced by his certificate, the railroad company was to pay the contractors as follows: Upon the execution of portions of the work to the satisfaction of said engineer in charge for the time being, eighty per cent. of his monthly estimates of the relative value of the work performed, including materials furnished at the site of the structure, to the first day of each month, was to be paid on or before the 15th day of the month; and the balance shown by the engineer's certificate to be due on the contract was to be paid on the completion of the entire work, and upon the production of the engineer's certificate showing such balance.

580                    SUPREME COURT.

John T. Howard et al. v. P. & A. R. R. Co.—Opinion of Court.

Howard, in his testimony, puts in evidence monthly certificates or monthly estimates for work done in December, 1881, February, March, April, May and June, 1882. These, he says, are the estimates of Chief Engineer A. W. Gloster. There are also in the record monthly estimates for the months of August, 1881, and September, 1882, and for each of the intervening months; those for August and September being signed by Colin A. Davies as "Assistant Engineer," and the others by Gloster as Chief Engineer. These were put in by the defendant. Davies disclaims having made the calculations on which those signed by himself are based.

Howard, in his bill as amended, alleges that in April, 1883, he had fully and completely performed the work undertaken, in accordance with the contract, and to the entire satisfaction of the defendant's Chief Engineer, who prepared and furnished him a final statement or estimate of the work, bearing date the 5th of said month, and of which a copy is made a part of the bill.

This final estimate is assailed by Howard. His first charge against it is that the Chief Engineer has, through mistake or fraud, allowed him for total excavation and haul the sum of only $113,164.29, when he should have allowed him $123,277.85, a difference of $10,113.56.

Howard, in his testimony, gives the quantity of earth *excavation* which he claims was done on each section, and the figures given by him (excluding those relating to his claim for extra work) aggregate 379,961 cubic yards, excluding 995 yards of ditching, and 380,956 yards including the ditching. He says these figures are given from monthly estimates made by Gloster prior to July, 1882. He produces the estimates as a part of his testimony, they being those for December, 1881, February, March, April, May and June, 1882. As we understand the "monthly esti-

JUNE TERM, 1888.      581

John T. Howard et al. v. P. & A. R. R. Co.—Opinion of Court.

mates," they show the whole quantity of work done under the contract on a section up to the end of the month for which the estimate or report is made, and not merely the quantity done during such month. Comparing the figures as given by him in his testimony with those given in the monthly statements annexed by him thereto, we find, in the case of sections 1, 4, 5 and 10, that they are reduced by the estimate for June from the figures given by Howard and to be found in some former one or more of such estimates, as follows: 9,200 cubic yards on section 1, and 296 yards on section 4, and 1,139 on section 5, and 2,542 yards on section 10, making an aggregate reduction of 13,177 cubic yards.

It is true also, however, that Howard has adopted the figures given as to section 8 in the April and June estimates, although they are 1,854 cubic yards less than those in the estimate for December; and in the case of section 14 he has adopted the April estimate, which is 755 yards less than that for March, and in the case of section 19 he has adopted that for May, which is 999 yards less than that for December and February, and in the case of sections 23 and 24 he has adopted those of June, which are respectively 1,696 and 127 yards less than the figures given by the May report; these differences making an aggregate of 5,432 yards more than the reports adopted by him in the case of the five sections mentioned in this paragraph, show.

As we understand Howard, his contention is that the railroad company should pay him for the quantities of earth excavations stated in his testimony, and as shown by those monthly estimates adduced by him, in which the same quantities are to be found.

The defence of the railroad company is, in short, that disputes had arisen between it and Howard both as to

582 SUPREME COURT.

John T. Howard et al. v. P. & A. R. R. Co. —Opinion of Court.

whether the work had been done in accordance with the contract of July, 1881, and as to the amount due to Howard, survivor, and that the agreement of April 24, 1883, appearing in the statement of the case, was a settlement of those disputes, and that Howard is bound by it and the action taken under it; that it covers the matter of earth excavation, as well as other matters not excepted by its terms, and adopts the estimate of the quantity of earth excavation shown by Davies' final estimate of April 5th, referred to above.

This agreement of April 24th, 1883, is, upon its face, unmistakably one for payment to Howard, as the survivor of Howard & Walker, of the balance due as shown upon the "*final*" given Howard by Engineer Davies April 5th, 1883; and the sums payable thereunder, including the amounts to be withheld for special purposes mentioned in the agreement, are made expressly a "full and complete satisfaction for all claims of Howard & Walker, and Howard, survivor, under said contract of July 25th, 1881," except the account for the iron and timber at the Apalachicola river, which were to be measured and weighed before being paid for. The language of the preamble of this agreement also shows that the parties to it understood the contract of July 25th, 1881, to be that set forth " in said contract and *specifications* thereto *annexed.*"

Howard contends in his bill that the agreement of April 24th was never intended as a statement of account between him and the defendant, and, further, that at the time of making this agreement he had not had any opportunity for examining the statement of April 5th; that he has since done so, and found it to be incorrect and false and fraudulent, and totally at variance with the previous estimates of the defendant's engineer, which had been made monthly and accepted by Howard, and made the basis of his previ-

ous settlements with both the defendant and his own sub-contractors; and further, that the defendant, at the time of making the above agreement, admitted that the final estimate of April 5th did not show the true and correct balance of money due, but acknowledged itself to be indebted to him in the sum of $43,634.05, or $9,152.27 more than was shown by the final estimate, and that the difference between himself and defendant touching the completion of the work, which led to the contract of April 24, was referred to one Pickett and decided by him.

Howard, in his testimony, states that he received the final estimate on April 12, and that it shows a balance of $34,255.99 to be due him, and he called defendant's attention to its incorrectness in not including the correct amount of earth work, timber, iron and ties, and objected to a settlement on account of these errors, and requested a reference of their differences in these particulars to a referee, but that defendant refused to consent to a reference unless he, Howard, would receipt in full of all demands whatever. He also acknowledges the receipt on April 16 of the letter of April 13th, from Chipley, Vice-President of the company, to be found in the statement, and says that subsequently, on April 24th, the agreement of this date was executed. Of this agreement he says it was made for the sole purpose of settling the difference between them touching the completion of the trestle referred to in the letter of April 13th, and that this was distinctly understood at the time, and that it was never intended as a statement of account between them. He further says that at the time of making the agreement he had not carefully examined the final estimate, but had examined it sufficiently to know that it was incorrect, but did not ascertain until afterwards that it differed so materially from the

mouthly statements of Gloster. That this agreement was made without any consideration, and that the moneys which the defendant thereby promised to pay him are moneys due and owing to him by defendant in addition to other moneys.

The origin of the controversy as to the quantity of earth work is attributed by the defendant to the fact that the resident engineer on the work undertaken by Howard & Walker adopted a rule or method of measurement contrary to the one provided by the " specifications," which specifications are a part of the original contract of July 24, 1881, as is shown both by its terms and by the " proposal " of Howard & Walker, from both of which extracts are to be found in the statement of the case.

Davies, a witness for the defendant, who was in its employ as an engineer from October 21, 1881, till January, 1885, he having succeeded Gloster as Chief Engineer early in November, 1882, says that it was discovered in April, 1882, that the resident engineers had overestimated the work by allowing for all the material in both excavation and embankment, or by measuring according to what is commonly called " road-bed measurement," by which all the material in the excavation and embankment, anything within the slope stakes or side stakes, is measured, whereas the specifications, it is claimed, allowed the contractor for excavation only, and also for hauling, (if the average distance hauled exceeded three hundred feet,) at the rate of one cent per cubic yard per hundred feet for such excess. That he noticed while engaged in revising estimates in Gloster's office, in the April mentioned, the fact that on some sections these estimates were overrunning the approximate estimate made before the work was begun, although such sections were not yet finished, and that he called Gloster's attention to it, and the latter had an investigation

made by his office engineer, and they found that the resident engineer had overestimated the work done and in the manner referred to.

That there were reductions made on Gloster in his monthly estimates on certain sections, is evident from what is set forth in two preceding paragraphs of this opinion discussing such estimates. It is also a fact that Gloster's report for July reduces the work on section 10 from 10,010 yards, the quantity in the report for April, to 8,964 yards, or, in other words, makes a reduction of 1,046 yards.

The witness Davies also testifies that he discussed with Howard and one or two of his sub-contractors, and resident engineer Matthews, at Marianna in December, 1882, the general question of earth work, and Howard complained that he had been unjustly dealt with; that witness, who says he had supposed that Gloster had settled the matter, told Howard he knew nothing about his work, but would cheerfully reinvestigate any claim he might make; that he had not himself calculated the earth work, but that Gloster had calculated all the earth work during the latter part of October, 1882, and had, when he left the service of the company, turned over to witness the result of the calculations, and witness gave to Howard these figures showing the quantities allowed by Gloster, to compare with his own estimates, and told him that unless he objected witness would accept and use them on the final estimate without recalculations, but if he did object witness would recalculate the quantities on those miles as to which objections were made. These figures, as shown by the record, give the quantities for each section, and, including 10,047 yards of ditching and extra work, aggregate 325,321 cubic yards, or 55,635 cubic yards less than is claimed by Howard in his testimony. This witness also testifies that on the 26th of January, 1883, he sent Howard a statement of quanti-

ties of earth work which he proposed to allow him, telling him he had gone carefully over the notes of Howard's work as they were found in witness' office, and asked him, if he had any further claims to make, to present them quickly, as witness wanted to close the matter. A copy of this statement is in evidence, and the quantities allowed on the different sections aggregate, exclusive of haul, 331,025 yards, which is 5,704 yards more than the aggregate of the Gloster statement spoken of above in this paragraph, yet 49,931 yards less than Howard claims in his testimony.

Chipley, the Vice-President and General Superintendent of the company during the years 1881, 1882 and 1883, and who says he has no interest in the suit, testifies that there had been issue between the parties in regard to the payment for cross-ties and method of calculation on earth work, the plaintiff contending that the earth work should be measured by road-bed measurement, whereas the contract provided differently, and that this disagreement was provided for in an agreement of February 26th, 1883, which he puts in evidence. This agreement, which is set out fully in the statement, recites that there have been "differences" between the railroad company, naming it, and "Howard, Walker & Co.," and, (omitting for the present all reference to its settlement of the controversy as to cross-ties.) provides expressly that if the President approves, finals upon all earth work about which there is *no issue* will be given February 28th, "it being fully and distinctly understood and agreed by Howard, Walker & Co. that any differences on the disputed earth work are to be settled upon the calculations of Principal Engineer Davies, with and after a consideration of all claims of said Howard, Walker & Co." A further provision of it is: "Should the President not approve a final, then it is agreed that Mr. Davies shall during March make any examination of

the grading requested by Howard, Walker & Co., and on or before March 25th announce his final decision by a final estimate and payment, this question of *grading* being the *only question* in the way of a *final* and *complete settlement.*" It is signed—

> "W. D. CHIPLEY, Gen'l Supt.
> "HOWARD, WALKER & Co."

Davies says of this agreement that it was one by which all differences on disputed earth work were to be settled upon his calculations, and that Howard knew that the second method would be used in these calculations, as they had frequently discussed the matter; that it was written and signed in the office of Chipley, and he was present at the interview at which it was done, took part in the discussion, read the agreement after it was written, and saw both parties sign it.

Davies says further that he, on March 31st, 1883, made a final estimate of all the work done by Howard & Walker and Howard, and that this is the one usually referred to as the estimate of April 5th, 1883, because on the latter day he made a full statement of the work and sent it to Howard in a letter of the same date.

Of this final statement of April 5th and of the agreement of April 24, 1883, Chipley testifies that Howard did know of the contents of the *final statement*, that he knows this from Howard's own statements that when the final examination of plaintiff's work was made it was found not to be up to the contract, and the object of the *agreement* was to settle all differences except the matter of iron and trestling at Chattahoochee, and to secure an agreement under which the smallest amount possible of the reserve of 20 per cent. provided by the original contract would be retained to secure proper completion of the work, the balance of the reserve being paid Howard to relieve his alleged

pecuniary embarrassment; that he discussed fully and several times with Howard what the terms of the agreement should be, and that it covers all differences, save the exceptions made therein, but nothing that was not previously agreed to. That the trestles and method of measuring the earth work were discussed more than anything else at the conference, and the result was the agreement referred to, the same being signed at the railroad office at Pensacola. That Howard came to the office with his banker, and said he had come to secure his money; and that he urged his urgent need of money, and that the result was a proposition to pay him all but such sum as would guarantee completion of work and protection against garnishments; that witness consented to this and the agreement was drawn and signed; the defendant thus agreeing to pay a large amount of the reserve, which was not due until the contract should be completed. That Howard claimed that the work was completed, and sometimes he would insist it was according to contract and again would admit that it was not his fault, that his sub-contractors had deceived him. That on the day of the said agreement the plaintiff and defendant made a statement of accounts and an adjustment between themselves, and did strike a balance, which is shown by said agreement.

Davies' testimony as to the "final statement" and the agreement referred to in the preceding paragraph of this opinion is, that he was present at the conference of April 24, resulting in such agreement, as were Howard and Chipley, R. M. Cary, Jr., and George Lewis, the agent or attorney of Howard, and Howard acknowledged the receipt of the final estimate which had been sent him, and said it did not allow him as much earth work as he thought it should, when witness told him they were far short of the amounts estimated by Gloster under the first method, and that he,

Howard, had known for months that no such amount would be allowed, and referred him to the statement of January 26th. Howard, he says, was not satisfied with the quantity of earth work, but in order to come to a settlement agreed to abide by it. That the condition of the trestle was " taken up," and Howard was told that he could not be paid in full until his trestle work was put in proper condition. Howard asked that a portion of the reserve percentage be paid him, but was reminded that under the original contract none of this reserve was due until the entire work was done according to the contract; that the garnishment suits were then " taken up," and the agreement put in writing. That it was the understanding of every one present that it should be a final settlement of all differences respecting grading, the entire matter being fully discussed.

That the first method adopted by the resident engineer was road-bed measurement can hardly be doubted. Howard not only fails to state anything to the contrary in his testimony, but his witnesses, John M. Cook and W. K. Atkinson, confirm the defendant in its contention on this point: Cook, who says he was resident engineer on Howard & Walker's work from July 17th to November 13th, 1881, and made the estimates of earth work for this period, testifies that they were made by road-bed measurement; and Atkinson, who was such engineer on sections 6 to 25, inclusive, from November, 1881, to August, 1882, says that for the first two months his estimates were based on road-bed measurement, and afterward they were by " average haul," and after this credit was not given for earth work put in the embankment, but only for earth excavated and one cent per cubic yard for each one hundred feet of haul over three hundred feet. Davies says the change of method took place in April, and there is consequently a discrepancy

of three months as to the time of this change between his recollection and the effect of the testimony of these witnesses, but we do not find that any monthly estimate prior to that made in April shows a reduction.

The fact that Gloster's estimates show reductions is, in the absence of an explanation to the contrary, evidence that he had become satisfied for some reason that there was error in his former estimates. No one attributes these reductions to any other cause than that the prior estimates were made upon an erroneous basis.

In view of the whole testimony it cannot be denied that a controversy had been pending between Howard and the railroad company as to the quantity of earth work actually performed by him, according to the terms of measurement prescribed by their contract, when the agreement of February, 1883, was made. That there was ground for the controversy on the part of the railroad company as against Howard's claim, as it is advanced by him in his bill and testimony, is shown by the monthly estimates of Gloster, which he puts in evidence, to say nothing of the undisputed testimony of Chipley and Davies. By the February agreement it was expressly provided that any difference on disputed earth work should be settled upon the calculation of Engineer Davies. These calculations, when made, proved, as they are presented by the final estimate, to be larger by 16,125 cubic yards, exclusive of haul, than his estimated statement of January 26th, and 31,829 yards in excess of the Gloster statement handed by Davies to Howard, at Marianna, in December, 1882, yet less, of course, than what is claimed by Howard in his bill and testimony, as he must have expected them to be in view of the difference in the two modes of measurement.

There is no evidence of any fraudulent conduct or practice upon the part of Davies or any one else in making the

JUNE TERM, 1888. 591

John T. Howard et al. v. P. & A. R. R. Co.—Opinion of Court.

final estimate; no concealment, deception or other improper conduct is shown; if there is any mistake in his calculations or in the result they reach, as shown by this estimate, it has not been disclosed; there is no attempt to show that there is any such error or mistake in them, assuming that the basis upon which they are made, viz: the second or "average haul" method, is the correct one. The testimony is that they are made upon the same cross section notes of the resident engineer that Gloster's estimates were made on, the difference in result as to quantities being in the main attributable to the difference in the two methods of measurement. The only ground for Howard to urge claim of mistake is that the road-bed measurement is correct, and this idea is not consistent with either the contract and specifications, or the testimony. There is an entire failure to prove the allegations of either fraud or mistake Allegations of mistake, fraud or falsity must not only be specific, but they must be proved. If they are sufficiently specific, they still have not been proved, in the case before us.

Considering Howard's statement in his bill and in his testimony as to his understanding of the contents of the final statement, there is no reason why he should not have understood it fully. He received it on April 12th; why he did not have an "opportunity" to examine it any more fully than he may have done is not explained. The time between the 12th and the making of the agreement of April 24th was ample for the fullest examination. His testimony shows that he called defendant's attention to its incorrectness as to earth work, timber, iron and ties, and objected to a settlement on account of these errors. He does not inform us as to the extent of such incorrectness, as pointed out by him, nor in what quantity it, according to any discovery he may have made subsequent to the April

agreement, exceeds what he then thought the same to be. Howard does not say anywhere that he did not know the contents of the final estimate of April 5th at the time of making the agreement in question, but the substance of his complaint is really nothing more than that he did not then fully appreciate the difference between the quantities given by it and those represented by Gloster's original monthly statements. In the absence of any fraudulent or other illegal conduct on the part of the defendant, or its representatives, we are unable to see that this is of itself either any ground for relief against the defendant or of any complaint on the part of the complainant. He alone, under the circumstances of the case as disclosed by the evidence, is responsible for failure to appreciate properly the difference; he had Gloster's original statements in his possession and knowledge, and he shows that the fact that there was a difference known to him, and yet he made the agreement or settlement of the controversy, and he fails to prove that there is in fact any error, or wrong in it.

There is nothing in the details of the actual execution of the agreement of April 24th establishing any unfairness or fraud. Of the five persons present at the time we have the testimony of all except Mr. Lewis, the "agent" of Mr. Howard, as he is called, and of Mr. Cary. We cannot assume that Lewis or Cary's recollection of the transaction would present it in an aspect more favorable to the complainant.

The position of complainant that this agreement was made for the sole purpose of settling the difference between them touching the completion of the trestle referred to in the letter of April 13th, 1883, set out in the statement, is wholly inconsistent with the language and plain meaning of the agreement, and is squarely met by the evidence of Chipley and Davies. One effect of the agreement is, it is

true, to provide for the immediate completion of any work which the engineer of the company should determine to be necessary to complete the original contract of July, 1881, and it is safe to say that the defective trestle work alluded to in the letter of April 13th led to this feature of it, but it is entirely clear that the agreement fixes on the basis of the final estimate the amount of compensation to be paid for the completion of all work, except the surplus iron and timber at the Apalachicola river, which by its terms are to be measured and weighed before being paid for. The view of it taken by complainant seems to lose sight entirely of what it actually settles, and to comprehend only what it provides a mode of settlement for.

There is a positive denial by Chipley and Davies of Howard's statement that defendant, at the time of making the agreement, admitted that the final estimate did not show the true and correct balance of money due, and acknowledged itself to be indebted to him in the sum of $43,624.05, or $9,152.27 more than was shown by the final estimate. They also deny that there was such indebtedness.

Counsel for appellant admits in his argument that the difference in the quantities of excavation, or earth work, is attributable to the difference between the two modes of measurement, but contends that the road-bed measurement is the method upon which Howard is entitled to be settled with. In support of this position he denies that the con-tract of July, 1881, prescribes a different method, and contends that the specifications are not a part of such contract. That the specifications do form a part of that contract is apparent from the contract itself, and the proposal of Howard & Walker and from complainant's bill in its presentation of the contract; and that the specifications contained

in the record are those referred to in the instruments just mentioned is clearly shown by the testimony and pleadings. That a contract may be embodied in several instruments in this manner is indisputable. Tonnele vs. Hall, 4 N. Y., 140. The specifications do form a part of the contract in question, and do provide for measurement in the excavation only of materials moved, and against compensation for putting them into the embankment, except the pay for haul where the average distance hauled exceeds three hundred feet. We do not understand that any different construction of the specifications, assuming them to be a part of the contract, is contended for by any one.

Counsel further argues that in the absence from the contract of everything indicating the method of measurement contemplated by the parties, the one adopted by them under it when they entered upon its execution should be taken as the one actually intended by them. What we have said of the contract, including the specifications as a part of them, may be sufficient to answer the above proposition, so far as it is applicable to the case before us. Its premise is overthrown by the fact that the specifications are a part of the contract, and do show what method of measurement was contemplated by the parties,

If it be, however, that the adoption and pursuit of the road-bed measurement for the time admitted by the railroad company, viz: from August, 1881, till April, 1882, is sufficient, notwithstanding the provisions of the contract and the subsequent conduct and dealings of the parties, to hold the railroad company to such measurement, we should say so. If after discovery that the resident engineers on the work, and whose function it was to ascertain by measurement and calculations the quantity of earth work, had improperly adopted the road-bed measurement, the railroad company had continued in the use of such measurement

and to make monthly settlements according to it, there would be more room for the idea suggested by the case of Kidwell vs. Baltimore & Ohio R. R. Co., 11 Grat., 376, where the contractor did, with the knowledge and consent of the company, a particular part of the work in a different, superior and more expensive manner from what the contract provided for, but received pay from time to time the amounts awarded him in the monthly estimates at the price or rate stipulated in the contract for doing it in the manner provided therein, and with notice that the company did not intend to pay more, and it was held that he had acquiesced in the construction that he was to be paid for the substituted work on the basis provided by the contract as compensation for doing it in the original manner, and his claim of $35,000 on account of the manner in which the work was actually done, was denied.

The position of the railroad company before us is very different from that of the contractor in the Virginia case, to which it is attempted to assimilate it. It is clear that Gloster, when he made the monthly estimates of the amounts due for the several months in which the quantities of earth work furnished him by the resident engineers were by road-bed measurement, did not know that such was the fact; it is further shown that Howard himself also calculated the quantities and participated in the same error that the resident engineers fell into; he as well as they were in error, and neither of them should gain any advantage by this forgetfulness of the provisions of the contract. As soon as the error was discovered it was abandoned, and there was no course of dealing upon the part of any one which can be regarded as an intention to substitute another thing for what has been written in their contract, and the conduct of the railroad company shows nothing but a positive determination to insist upon and adhere to

the contract as it is written. That the time of making payments may be established and made binding on the parties by mutual conduct, in the absence from their contract of any provision on the point, or that the mode of payment prescribed for a certain work, such mode being in its nature applicable to payments for partial alterations or additions in the work, will control the mode of payment for such alterations or additions subsequently agreed upon, as was held in Brady vs. The Rutland & Bur. R. R. Co., 3 Blatch, 25, is neither denied nor inconsistent with our views of the case before us.

It is also contended that as the estimates of Gloster were made during the progress of the work and furnished to Howard and accepted by him, and made the basis of the latter's settlements with the defendant and also with his own sub-contractors, the defendant is estopped to deny that the road-bed measurement, or the estimates made in accordance therewith, were proper and legal.

The contract, it is urged, provided for monthly estimates and imported an accurate measurement and final estimate for each month, and it was the duty of the defendant to furnish such; that the defendant knew that Howard & Walker were making monthly settlements and paying to their sub-contractors based upon these estimates, and that any errors or omissions therein would entail loss and damage on Howard & Walker.

Howard testifies that Howard & Walker contracted with their sub-contractors upon the basis of the monthly estimates to be furnished by the defendant's Chief Engineer, and agreed to pay them monthly 80 per cent. of said monthly estimates and the balance of 20 per cent. when the work was completed, and settled with them on this basis and according to the estimates furnished by Gloster, and that plaintiff would suffer a great loss and damage un-

less the defendant is required to settle with him by such estimate. On cross-examination he says he settled with his employees on such estimates for the months of December, 1881, February, March, April and May, 1882. That Howard & Walker agreed to pay their sub-contractors twenty-five cents per cubic yard for excavation and twenty-two cents per cubic yard for embankment, and to pay them monthly eighty per cent. of the monthly estimate of their work and the balance upon the completion of their work. That all the sub-contractors except Miller & Baker and H. C. Curtis had been paid prior to March 1st, 1882, and at that time they were owing their sub-contractors about $7,000.

Gloster testifies that he told the contractors never to settle with sub-contractors except upon statements from the Chief Engineer's office, as nothing else would be considered official. Atkinson's testimony is that he believes Howard & Walker were advised by Gloster to settle with their sub-contractors by said estimates; that the advice was verbal, and he so understood it.

The record shows that the measurements and calculations, or estimates of the quantities, were made monthly by the engineers resident on the work and sent by them to the Chief Engineer's office at Pensacola, where the calculations of the amount earned and payable on the work was calculated, and then a monthly estimate of the character heretofore discussed in this opinion was made and signed by the Chief-Engineer and sent to the contractors.

Howard, testifying on cross-examination, says: "I made an estimate each month of the earth work as it progressed, and compared my estimate with those of the resident engineer. My means of knowing the quantity of earth work done by Howard & Walker for defendant, in addition to the knowledge thereof derived from the estimates of A. W

598 SUPREME COURT.

John T. Howard et al. v. P. & A. R. R. C'. -Opinion cf Court.

Gloster and C. A. Davies, is a recollection of the estimate made by me as the work progressed from the original notes of the work furnished Howard & Walker by defendant's engineers agreeing with the estimates furnished Howard & Walker by A. W. Gloster, except on sections 13, 17, 18, 19, 20, 23 and 24, where a change of grade was made and depot grounds. I did have the original notes on each section from 1 to 25, inclusive, but have mislaid all of them except the attached. The final estimate of C. A. Davies includes all of the earth work except on section 17, and he allowed the same to Howard & Walker on evidence furnished by me."

Considering the contents of the above paragraph, it is evident that Howard knew the method of calculations used by the resident engineer. He is, moreover, as much chargeable with knowledge of the contents, meaning and effect of the contract, including the specifications and "proposal," as the resident engineer; ignorance of them is no more imputable to one than the other; particularly is this so when we consider that he shows that his attainments were such as to enable him to make estimates himself. He, under all the circumstances, ought to have known as well as the resident engineer, and, we may say, better than Gloster, that the quantities mentioned in the estimates were not ascertained on the method prescribed by the contract; if one knows, or under all the circumstances ought to know, the actual facts of the thing represented, the estoppel falls to the ground. One claiming the benefit of an estoppel of this kind must show that he is ignorant of the truth of the representation by which he claims to have been influenced or misled, and to have suffered from acting upon.

In Herrick vs. Belknap et al., 27 Vermont, 673, cited by counsel for appellants, the contract provided, among other

things, (1) that the work should be done to the satisfaction of the engineer of the Vermont Central Railroad Company; that the engineer should be the sole judge of the quality. and quantity of the work specified in the contract, and that from his decision there should be no appeal; and (2), that the engineer should, between the first and tenth day of each month, estimate the quantity of work done, for which the contractor should then receive three-fourths of the amount to be paid him for said work, and the remainder after the completion of the work. The Supreme Court of that State held the first of the above clauses to be binding upon parties and to constitute the engineer an umpire or arbitrator between them; and as to second clause, that a contract providing for monthly estimates of the contractor's work, according to which he is to be paid, imports an accurate measurement and final estimate for each month, and not such a one as is merely approximate or conjectural; and, further, that a court of equity has jurisdiction of a claim to be paid for a larger amount of work done under such a contract than was estimated by the engineer, where the underestimate was occasioned by either mistake or fraud.

In Kilbury vs. U. S., 97 U. S., 398, a contract between the government and another for the transportation by him of stores between certain points, provided that the *distance* should be *ascertained* and *fixed* by the Chief Quartermaster, and that the contractor should be paid for the full quantity of stores delivered by him on annexed schedule fixing the sum to be paid for each one hundred pounds of stores transported. The distance, as ascertained and fixed by the Chief Quartermaster, was less than by air-line or by the usual and customary route, but it was held that his action was, in the absence of fraud or such gross mistake as would necessarily imply bad faith or a failure to exercise

an honest judgment, conclusive upon the parties. "There is," says the opinion, after remarking that the language to *ascertain and fix* the distance was susceptible of no other interpretation than that the decision of the Quartermaster in the matter of distance should be conclusive, "neither allegation nor proof of fraud or bad faith upon his part. The difference between his estimate of the distances and the distances by air-line or by the road usually travelled is not so material as to justify the inference that he did not exercise the authority given him with an honest purpose to carry out the real intention of the parties, as collected from their agreement." In Sweeny vs. U. S., 109 U. S., 618, it was held that when a contract with the government for building a wall provided that payment for the work contracted for shall not be made until an agent, to be designated by the government, should certify that it is " in all respects as contracted for," and after completion of the work the designated agent refuses to give the certificate, and there is no fraud nor such mistake as would necessarily imply bad faith, nor failure to exercise honest judgment on the part of the agent, the engineer's certificate is a condition precedent to payment. The officer designated refused to give the certificate in this case on the ground that neither the material nor the workmanship were such as the contract required. Martinsburg vs. Potomac R. Co., 114 U. S., 549, is a case in which a contract for the construction of a railroad provided that the company's engineer should in all cases determine questions relating to its execution, including the quantity of the several kinds of work to be done and the compensation earned by the contractor at the rates specified ; that his estimate should be final and conclusive, and that whenever the contract should be completely performed on the part of the contractor and the engineer should certify the same in writing under his hand,

together with his estimate aforesaid, the company should pay within thirty days the sum due according to the contract, and it was held that in the absence of fraud or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment, the action of the engineer in the premises was conclusive upon the parties. See also Butler vs. Winona Mill Co., 28 Minn., 205 ; Moore vs. Kerr, 65 Cal., 519.   In Finnegan vs. L'Engle, 8 Fla., 413, by the terms of the contract the work was to be done to the satisfaction of an engineer of the road, and this was held to be an appropriate engagement, that will be enforced and carried into execution by the court, and whilst his certificate will not be regarded as conclusive and unassailable, yet it will be " without fraud or special showing to avoid its effect."   We infer from the opinion that " mistake " was regarded by the court as within the " special showing " meant by it in this case.   In Memphis C. & L. R. Co. vs. Wilcox, 48 Penn., 161, the decision was that the estimates and decision of an engineer of a railroad company are conclusive in disputes with contractors only where such is the stipulation in the contract ; but that in every other case the estimate of the engineer is to be tested by its correctness, and in an action against a company by a contractor to recover a balance due for work, an instruction to the jury to rely on the engineer's final estimates, unless shown to be erroneous, is not error.

Referring to the contract before us, it is clear that the work was, under its terms, to be done by Howard to the satisfaction of the engineer in charge, or Vice-President for the time being.   It is further clear that upon the execution of portions of the work to the satisfaction of the engineer in charge for the time being, eighty per cent. of his monthly estimates of the relative value of the work performed (including material furnished) to the first day of each month

was to be paid the contractors by the company on or before the 15th day of the month; and the balance was to be paid on the completion of the entire work. The balance payable on the contract was to be paid on the completion of the entire work, and not before, and then on the production of the engineer's certificate showing balance due on the contract.

There is in the specifications another clause which throws light on the spirit of the contract. It is as follows: The contractors will remove at their own expense any material disapproved by the engineer, and will remove and re-execute any work without extra charge, and within such time as fixed by the engineer, appearing to him during the progress or after completion to be unsoundly or improperly executed, notwithstanding *any certificate as to the due execution of the same.* On their default such work will be done by the railroad company at the contractors' expense.

We can, without invoking the last clause, say that we are not prepared now to deny that the error as to the method of measurement is such as a court of equity would give relief against under such a contract. McAvery vs. Lay, 13 Ill., 147; Alton R. R. Co. vs. Northcott, 15 Ill., 49. The fact is, though, that the parties by their action, as shown by the agreements of February and April, have themselves given relief, and neither could afterwards insist upon the original estimates or certificates. Howard knew of the settlements made by him with his sub-contractors before these agreements were made. If any such settlements have been made subsequently, he would be in no better position as to those so made. The law favors the settlement of disputes and differences. The prevention of litigation is a valid and sufficient consideration. 1st Parsons on Contracts, M., pp. 438, 439; Clark vs. Gamwell, 125 Mass., 428; Barlow vs. Ocean Ins. Co., 4 Metcalf, 270;

JUNE TERM, 1888. 603

John T. Howard et al. v. P. & A. R. R. Co.—Opinion of Court.

—— vs. Kuhn, 61 N. Y., 623. The submission of the differences to the company's engineer was legal, 27 Vt., 673; 97 U. S., 398, and 8th Fla., 413, *supra*, and Howard is concluded by the result of his own agreement.

III. The next subject of contention between the parties is the complainant's claim of $1,500 for five thousand yards of excavation (at 30 cents per cubic yard) in excess of Gloster's estimate, on the seventeenth section of the part of the road undertaken by Howard & Walker. This, he says, is not included in the final estimate referred to above, nor in any of Gloster's monthly estimates. In his testimony he states there were " excavation and embankment " done under the orders of Gloster on eight of the sections, giving the quantity done on each of them, and putting that on section 17 at 5,175 cubic yards at the price stated. He admits that none of this earth excavation and embankment was included in any of Gloster's estimates, but that all of it, except that on section 17, is included in Davies' final estimate of April 5th, 1883.

Howard testifies that he has lost the original notes showing the difference in the original and the change of grade on this section, and that Davies refused to allow this additional work in his final estimate because witness could not produce these notes. He gives from recollection of the original notes that had been in his possession, but states the condition of the work on this section at the time of the change, from a statement furnished by resident engineer Atkinson. It puts the quantity as of January 19, 1882, at 8,088 cubic yards of embankment and 877 cubic yards excavation, and is dated the 21st of that month. He states the quantities of excavation, embankment and ditching as of before and after the change of grade, and says Howard & Walker had completed most of the original grade before a change of grade was made; that the change of grade

necessitated the refilling of the excavation and raising the embankment, causing thereby 5,000 additional yards of earth work to be done; that it was ordered by Gloster.

Atkinson, a witness for complainant, testifies that the original grade was too low and had to be raised, and it was raised by order of Gloster; a cut which had been made in this section had to be refilled. When the grade was changed making twice the work; that he cannot state the size of the cut, but his division profile would show it. On the cross-examination he says the cut was 877 cubic yards, and that there were six or seven hundred feet of embankment which had to be raised about two feet to make the change, and that this embankment was dressed over, and afterward it had to be redressed when raised, thus necessitating considerable expense, as such dressing is expensive work. He turned over the original profile of the work to Frank Matthews, resident engineer of the third residency. "The labor that was lost," he says, "was refilling the cut and dressing about 600 feet." He also states that in speaking of the 877 cubic feet, his memory is refreshed from seeing his original memoranda, which is in the hands of Howard, but that the balance he says is from recollection.

Davies says Howard was not able to tell, or least never did tell, exactly how the grade stood when the change was ordered, or what earth work was done to alter it from its original condition to that in which it was when finally completed. That he never was able to come to any agreement with Howard respecting this extra work. That he allowed Howard 1,250 cubic yards of extra work on this section, this being the amount of extra work allowed him, by Gloster; that Howard was not satisfied with this allowance. That the value of the allowance was 30 cents per cubic yard, or $375. Upon cross-examination he says he refused to allow Howard's claim because its correctness,

could not be verified by any records or notes in the Chief Engineer's office, and not simply because he could not produce the original notes showing the grade. That witness diligently searched for notes bearing on the claim when it was made, but could not find them, and would not allow Howard for this large amount of earth work on Howard's unsupported statement. That he allowed the 1,250 cubic yards because he found in one of the cross section note-books filed in evidence a note that this quantity of earth work had been done on the section on account of change of grade. That he did not then, and does not now, know the amount of additional work on this section necessitated and done on account of the change of grade; and that the section was nearly all embankment, there being only a slight quantity of excavation in it.

It is contended on behalf of the railroad company that the excavation, which is the basis of his claim, is from its nature a *modification* of the work undertaken by Howard & Walker, within the meaning of that provision of the contract by which the latter agreed that they would " not execute any extra work, nor make any modifications or alterations in the work mentioned in said specifications and plans, unless ordered *in writing* by the said engineer in charge, nor claim payment for the same unless such written order be produced;" and being such, the company urge that the claim cannot be sustained, first, because there was no such written order, or, at least, as none has been produced ; and, second, because compensation for it was, by the terms of the contract, to be fixed and has been fixed by the Chief Engineer; and, third, it is covered by the settlement and agreement of April 24th, 1884

Counsel for Howard contends that the item in question was not " extra " work, within the meaning of the contract, but, as we understand him, was ordinary work under the

contract. The amendment to the bill designates it as additional work, necessitated by a change made under the direction of the company's engineer.

The validity of the above provision requiring a written order in the cases and for the purpose to which it applies, does not seem to us to be the subject of any serious doubt. Such a provision is intended for the protection of the railroad company, and where it is clear that any particular work is within its scope, we see no reason why it should not be enforced. It is not necessary, however, in this matter to say whether the work is or is not " extra," or in the nature of a *modification*, within the meaning of the contract. Whether it be one or the other, or neither, it was clearly within the settlement made by the agreement of April 24th, 1883, whether we consider the action and award of the Chief Engineer, Davies, as taken or done by him as Chief Engineer by virtue of the powers claimed for him as such officer, or we regard him as a referee chosen by the parties under the clause of the contract (numbered 5 in the statement) by which it was agreed that any dispute or misunderstanding as to the meaning or execution of the provisions of the contract, or any matters not covered by the contract, shall be referred to a referee, whose decision shall be final as between the parties. It would be useless to reiterate here what has been said before as to this agreement of April 24th. There is nothing in the testimony set out above as to this item, which excepts it from the effect of that agreement and the dealings resulting in it.

IV. Another matter of controversy is cross-ties. Complainant's counsel puts it at $2,319.15, and as being the difference between $17,093.25 allowed and $19,412.50 which should have been allowed, by the final estimate of April 5th, 1883.

Howard testifies that they furnished 82,208 cross-ties under their contract of July 25th, 1881. That the final estimate of Davies credits them with 80,000 ties at 25 cents per tie, and charges them with 14,096 ties at 28 cents per tie. He further says that Howard & Walker contracted to furnish 2,800 ties to the mile, and defendant agreed to receive and pay monthly eighty per cent. of the price of the same. They began furnishing them on the road September 1st, 1881, and furnished at least 5,000 per month, and requested defendant repeatedly to inspect, receive and pay for the same in accordance with the contract, but defendant failed and neglected to inspect and receive them until December 24, 1881, when A. C. White, defendant's tie and timber inspector, inspected and received 18,848 ties, which they previously furnished on the road, but defendant did not make any payment on the same until about January 20, 1882. "The defendant," he says, " credited Howard & Walker with 28,000 ties, when they were entitled to a credit of the 18,848 ties. Howard & Walker furnished during the months of January and February, 1882, on defendant's road, 18,000 ties, which were inspected and received by A. C. White, defendant's inspector, of which no estimate was made and returned to Howard & Walker. In the month of May Howard & Walker had furnished on the road 65,000 ties, and at that time were credited in the monthly estimates furnished to them by A. W. Gloster with about 35,000 ties. Howard & Walker repeatedly requested defendant's engineer to have the ties furnished on the road inspected and received and included in the estimate, but he neglected and failed to do so." He further says they furnished the full number of ties they had agreed to be furnished, and had them on defendant's line of road by September 1st, 1882, several months ahead of the track laying; and that they furnished, in addition to the 2,800

608 SUPREME COURT.

John T. Howard et al. v. P. & A. R. R. Co.—Opinion of Court.

ties per mile, 12,208 ties to replace burnt ties, and for side tracks and spur road to Sampson's Landing.

In May or June Chief Engineer Gloster, he says, without the knowledge or consent of Howard & Walker, employed Curtis & Shaw to furnish ties on the first five miles of defendant's road, and Miller & Baker to furnish them on the other twenty miles. That Curtis & Shaw were " required " to furnish 5,000 ties and Miller & Baker 10,000 ties, at 28 cents per tie. That the contract with these firms was made under the mistaken idea, as witness says Gloster informed him, that Howard & Walker had an insufficient number of ties on the road, when in fact H. & W. " had furnished on the first five miles of defendant's road all of the ties required therein before Curtis & Shaw got out any ties, as will appear by statement of John M. Cook, defendant's resident engineer, attached, and had also furnished on the other twenty miles all the ties required thereon before Miller & Baker furnished any ties at all. Cook's statement is a letter to Howard, signed officially, and dated June 29, 1882, stating that he had received orders from Gloster, Chief Engineer, to receive " on first five miles for 4.21 miles, not including trestle work, 12,760 ties, including 600 for side track and 500 in excess," and further, that the writer had already received 12,856 ties, " which, although 96 in excess, 'twill be all right."

He says Howard & Walker were delayed in furnishing cross-ties by the neglect and failure of defendant to inspect, receive and pay for ties monthly, as it agreed to do.

Upon the cross-examination Howard says he counted the ties furnished on defendant's road by Howard & Walker; that he does not know how many there were on each mile of the work contracted for, but knows they continued to furnish 2,800 per mile. He then states the number furnished each section, except sections 1, 23, 24 and 25.

JUNE TERM, 1888. 609

John T. Howard et al. v. P. & A. R. R. Co.—Opinion of Court.

They aggregate 77,208 ties, and he says all of these were received by defendant's resident engineer, and Howard & Walker paid their sub-contractors for them. The reason given by him for putting no ties on sections 1, 23, 24 and 25, is that there was no tie timber on these sections, and Gloster consented for him to put an excess on the other sections, to be carried forward by the construction train to these sections, if the contractor for track-laying consented to it, which he did. The above ties were put on the line of road before July, 1882, and afterwards Howard & Walker put about 5,000 additional ties on sections 12, 13, 17 and 18.

Chipley testifies that there had been issue between the parties as to cross-ties; that the dispute as to them was, as submitted to him by plaintiffs, that more ties had been gotten than the defendant needed, and he, witness, agreed to compromise and did enter into the agreement of February 26, 1883, discussed in a previous portion of this opinion. By the first paragraph of this agreement, which recites that differences have arisen between the parties, it is "agreed between the parties that the railroad company will pay H., W. & Co. for 80,000 ties, including the ties gotten by Curtis & Shaw and Miller & Baker; this to give to the R. R. Co. all accepted ties on line, and all not accepted and rejected gotten by H., W. & Co. themselves. This based on order of A. W. Gloster, held by H., W. & Co."

Davies testifies that Howard claimed that he had furnished, upon the order of Gloster, cross-ties in excess of the number used on the road; that he had put 77,208, Miller & Baker 10,513, and Curtis & Shaw 3,558 on the road-side for use on his contract, making in all 91,304 ties. He produces a letter from Howard to himself, dated January 27,

1883, in which he states the above figures, and says : " Now I think, to take all things in consideration, you ought to pay me for at least 80,000 ties and take them all ; that will give you 11,304 ties, and up to Gloster's rejection in July I had less than one thousand rejected. I want us, if possible, to settle everything ourselves without any trouble, and I am willing to do anything I can to that end. Cook, I know, has not given me anything on timber or iron on hand. I have 30,000 feet of guard rails, 30,000 feet brace timber, and 10,000 pounds iron to put them on with, on hand, and hope you will give me something on it. * * * * I will wind up the trestle before the next estimate day if you can get me the ties in time."

Davies also says that 70,000 ties, the number called for by the contract (1-2.2800 per mile for 25 miles) were not used because sawed ties, or ties hewn square, were used on the trestles, and there were many trestles, and some of them long ones, on Howard's contract. That the proposition contained in Howard's letter was accepted and the number allowed to him, partly on final estimate, viz: 68,-373, and partly in vouchers, viz :

| | |
|---|---:|
| February voucher, 1883, allowed for siding | 2,000 |
| February voucher, 1883, used in cribbing | 4,150 |
| February voucher, 1883, on Sampson spur | |
| March voucher, 1883, allowance to balance | 5,477 |
| These aggregate the number called for by agreement of February, 1883, viz : | 80,000 |

It is unnecessary to say more of this item than that it was compromised or adjusted on the basis of 80,000 ties, by the agreements of February 26th and that of April 24th, 1883. We have set out the testimony bearing upon the claim in order that it may be seen that there is nothing it taking the claim from under this settlement.

V. As to the other items claimed by Howard, but disallowed by the Chancellor, we feel that it is unnecessary to say more than that, if they are sufficiently proved, they are still covered by the agreement of April 24th, and we think it is improper to extend this opinion further with a recitation of the testimony. We have with great care and very considerable labor copied from the large record before us sufficient to clearly show the real character of this case. Duty to the parties concerned does not require more.

As to the items of iron and timber, excepted from the agreement of April 24th by the last clause thereof, it is sufficient to say that the finding of the Chancellor in favor of Howard is sustained by the testimony, and we see no ground for reversing it.

VI. There remain now but two points for our consideration. The matter of tender and the status of B. C. Lewis & Sons in this cause.

As to the former it is not pretended that there has been any such tender as would stop the running of interest. Such a tender must, of course, be followed by a *profert in curia*. Matthews vs. Lindsay, 20 Fla., 962.

As to B. C. Lewis & Sons' status, it is apparent upon the face of the assignment made to them that it is not an absolute assignment of the contract, but only as a collateral security for the payment of such sums as might be advanced by them to Howard for the purposes contemplated or covered by the assignment. It was, of course, never intended that Lewis & Sons should undertake the contract of building the road, etc., as provided by the contract between Howard & Walker and the company. In so far as there was, at the filing of this bill, anything due Lewis & Sons by Howard, they had a prior right as against Howard to be compensated out of any sum due to Howard by the company under the contract, and were entitled to the ben-

efit of the lien which the statute has attached to a per-
formance of the contract. Howard was entitled to the
balance. Both Lewis & Sons and Howard were proper
parties to the bill, and have been made such. 2 Jones on
Montgages, secs. 1374 and 1375; Robinson vs. Springfield
Company, 21 Fla., 203; McKinney vs. Miller, 19 Mich.
142; Norten vs. Werner, 3d Edwards Chany. Reports, 112.
If the equities of B. C. Lewis & Sons under their assign-
ment are such as would entitle them to exemption from the
adjustments and compromise settlements made by Howard
with the railroad company, such equities can be used only
in aid of a recovery of what may be due them for advances
made to Howard. There is nothing in the record that has
any tendency to show that Howard is indebted to them in
a larger sum than the amount of the decree. As between
Howard and the railroad company these equities cannot be
used either by Howard or by B. C. Lewis & Sons, as trus-
tees for Howard, and when these equities are invoked as
against the company, it must be upon the basis of and to
the extent only of Howard's indebtedness to Lewis & Sons.
Outside of this indebtedness, whatever is due by the rail-
road company belongs to Howard, and is subject to any
defence which the railroad company may have had against
him. All the parties are before the court, and Lewis &
Sons cannot recover for Howard what he cannot recover
himself. Lewis & Sons not having shown that Howard
owes them more than the amount decreed, it cannot be
held upon this record that they have been injured by the
action of the Chancellor in holding Howard to his agree-
ment and settlements. It is unnecessary to say whether or
not, under all the circumstances of the case, Lewis & Sons
would have been bound by Howard's actions if it had been

shown that his indebtedness to them was greater than the amount decreed.

The decree is affirmed and the costs will be paid by Howard.