HOTEL HALCYON CORPORATION AND THOMAS J. PETERS, *Appellants*, v. MIAMI REAL ESTATE COMPANY, *Appellee.*

En Banc. ·

Opinion Filed February 28, 1925.

Petition for Rehearing denied March 28, 1925.

WHITFIELD, J.:

1. All the facts that are well pleaded are admitted by a general demurrer to the bill of complaint.

2. Where the essential elements of an ordinary short term lease of real estate are definitely agreed upon by the lessor and lessee, and in addition thereto the subsidiary covenants that were mentioned by the parties as essential to a 99 year lease contemplated, were considered and agreed upon, and a portion of the first year's rent was paid and another portion of it arranged to the satisfaction of both parties, such considerations with other pertinent circumstances in the negotiations between the parties, afford an equity for an enforced execution of the 99 year lease, even though other incidental provisions may be expedient for the mutual protection of the parties.

3. This case is essentially different from Daubmyre v. Hunter, 86 Fla. 326, 98 South. Rep. 69.

ELLIS, J.: Headnotes as to first four propositions.

1. An objection that a bill for the specific performance of a contract to make a lease is multifarious or duplicitous is not established because tenants of the property not parties to the contract, but whose interests in the subject matter of the controversy may be conveniently settled in the suit, are made parties defendant, nor because the suit involves the enforcement of another contract between the principal parties for the sale of lands where such contract grew out of the contract for the lease and formed part of the consideration therefor.

VOL. 89, JANUARY TERM, 1925. 157

Hotel Halcyon et al. v. Miami Real Estate Co.—Opinion of Court.

2. A bill for specific performance of a contract or a lease may be maintained where the evidence of such contract consists of letters and telegrams which were exchanged between the parties.

3. Allegations of agency in a bill when such allegations are material and well pleaded are admitted by a demurrer to the bill for want of equity.

4. In a bill for the specific performance of a contract for a long term lease a prayer for a receiver and an injunction to restrain the defendant from encumbering or selling the property which is the subject matter of the lease, is incidental and permissible.

5. When a bill for specific performance of a contract for a lease is brought by one of the parties within seven months after the negotiations for such a lease were alleged to have been terminated, the objection that the bill shows negligence or laches on the complainant's part in seeking his remedy is not well founded.

6. An agreement between parties for the execution of a lease on real property must be certain as to the terms of the intended lease in order to be made the basis of a decree for a specific performance of the agreement.

An Appeal from the Circuit Court for Dade County; H. Pierre Branning, Judge.

Affirmed.

*Thomas B. Everhart* and *Brown & Stokes*, for Appellants;

*Bart A. Riley* and *Cooper, Cooper & Osborne*, for Appellee.

WHITFIELD, J.—A demurrer to a bill of complaint, seeking specific performance of an agreement for a ninety-nine-year lease, was overruled, and the defendants appealed.

158    SUPREME COURT OF FLORIDA.

Hotel Halcyon et al. v. Miami Real Estate Co.—Opinion of Court.

This opinion was prepared as a dissent from the last subdivision of the opinion prepared by Mr. Justice ELLIS, the first four subdivisions of which opinion are concurred in, and they with this addition now become the opinion of the court.

Mr. Justice ELLIS states that "the proposition to rent for a definite term of years to begin at a certain time and the rental to be paid had been made and accepted but other essentials were left to settlement by correspondence." "The parties had agreed to the execution of a lease and pursuant to such an agreement the complainant had paid a large sum of money to be applied upon the first year's rental, but the trouble is with the particular covenants which the lease was to contain." It is conceded that the lessee, the description of the property, the rental to be paid, the terms of the lease and the time of its commencement were agreed upon. These are perhaps all of the legal essentials of a short term lease. This being a lease for 99 years the lessor proposed and demanded that specified terms be included in the lease all of which terms and the ultimate agreement thereon appear by the following extracts from the correspondence made a part of the bill of complaint, viz.:

"I am enclosing fourteen points that would need to be included in the lease for my protection which I am willing to have you submit to Mr. Rand for his acceptance or rejection."

"Terms of option. $10,000.00 cash for thirty days with the option to extend fifteen days additional time provided Mr. Rand shows at the expiration of thirty days that this fifteen days is necessary to complete his arrangements.

"1. The lease to be for 99 years.

"2. Price as stated in schedule furnished.

"3. Payment of first year's rent, $75,000.00 cash on signing of lease, all following rents payable annually in advance.

"4. Fifteen days grace to be allowed on each payment of rent mentioned in the lease.

"5. Lessee to pay all insurance and to carry full insurance value on all buildings.

"6. Lessee to pay all taxes and assessments, City, County, State and Federal, together with any other legal assessment against the property.

"7. Lessee to pay income tax or other Government tax in case there is any assessed or charged against lessor on account of improvements or otherwise on the property other than cash paid to lessor on account of this transaction.

"8. In case of future legislation, either City, County, State or Federal affecting the title to this property on account of this lease, it is agreed that this lease will either be forfeited to Lessor immediately or proper steps taken by Lessor that will protect and guarantee title and property to Lessor.

"9. Lessor to retain all right and title to said property with full right to mortgage or sell subject only to this lease.

"10. In case of building or other improvements on the property by Lessee and before starting such building or other improvements a guarantee bond of ample and sufficient amount shall be given to Lessor by Lessee covering possible liens or other obligations against the property on account of labor, material or otherwise.

"11. Prior to any change or alteration or tearing down present buildings or improvements, a good, sufficient bond will be given by Lessee guaranteeing the construction of other buildings and improvements of equal value.

"12. In case of improvements or alterations of any kind being made by Lessee on the property, plans and specifications covering such improvements and alterations or changes are to be submitted to Lessor and approved by him prior to beginning work or such changes, improvements or

160 SUPREME COURT OF FLORIDA.

Hotel Halcyon et al. v. Miami Real Estate Co.—Opinion of Court.

alterations. It being understood that Lessor's approval will not be unduly withheld.

"13. A Guaranty Bond in the sum of $100,000.00 to be made by the Lessee to Lessor at the time of signing lease to guarantee and insure Lessee's faithful performance of this contract.

"14. All bonds and insurance to be written in old line companies satisfactory to Lessor and mortgagees and placed through the local agents in which Lessor is part owner."

The Lessee replied: "I have carefully considered Mr. Peters' 'Fourteen Points' as expressed in list attached to his letter to you of May 17th.

"While Mr. Peters' conditions are somewhat stringent I can readily see his position in the matter, for it is a large transaction and it is only natural that he should wish to be fully protected.

"I am entirely willing to comply with all of the Points except Points 3, 8, 12, 13 and 14 which I will comment upon and make some suggestions with regard to in the order stated.

"*Point* 3. I am willing to pay $10,000.00 cash for the option instead of $5,000.00 as I previously offered, but I do not see how I can pay the balance of $65,000.00 in cash on or before forty-five days. I would prefer to pay this rent semi-annually in advance. Can this not be arranged? I can assure you that I am going to go through with the deal whenever I pay $10,000.00 down and until I pay the full amount Mr. Peters can retain all the papers either in his bank or in the hands of his own attorneys. I will if desired give Mr. Peters security guaranteeing that I will go through with the deal and pay the balance of the year's rent, but I cannot well pay it until fall. Could I not pay an additional $5,000.00 on the 1st day of July and $5,000 per month thereafter for the purpose of keeping the option

alive until sometime in November, with the understanding that the option money so paid shall apply upon the rent? I will pay interest from July 1st upon the rent until it is fully paid and that when it is fully paid I be credited with such rentals as the property may have earned from subtenants since July 1st. We might execute the lease dating it July 1st and place it in the bank in escrow with instructions to deliver to me on or before sometime in November provided I pay $10,000 cash when the lease is placed in the bank and $5,000.00 per month thereafter, and the full amount on or before sometime in November with eight per cent interest from July 1st. I will also at the same time give Mr. Peters security that I will make these payments as hereafter described in my comment upon Point 13. It seems to me this would absolutely secure Mr. Peters.

"*Point* 8. I do not quite understand this provision. However I feel sure we can agree upon it as I am ready to consent to any reasonable provisions to guarantee the Lessor's rental.

"*Point* 12. I will be perfectly ready to submit plans to Mr. Peters provided I am protected and my hands are not tied in the matter of construction of such improvements as I decide upon. It will be to my advantage more than to Mr. Peters to see that the improvements are of a proper character and he can rest assured that they will be a substantial improvement to the property. I would not wish the lease to contain any clause which would have the effect of preventing me from placing substantial improvements on the property of whatever character I thought the property best adapted to.

"*Point* 13. It would be very difficult for me to give a bond such as referred to, but I am perfectly willing to furnish Mr. Peters with security in lieu of the bond. In order to give such a bond I would practically have to give the Company cash or securities equal to $100,000.00, and this

6—Vol. 89.

would make it impossible for me to put the building upon the property which I had planned, as I will need the money for that purpose. I suggest that I convey in trust to Mr. Peters or some Trustee named by him other property of mine equal in value to $100,000, guaranteeing the performance of the lease until such time as I place upon the Halcyon property improvements totalling more than $100,000, at which time these improvements will in themselves be sufficient guarantee. I could offer Mr: Peters or the Trustee he may name, a trust deed to say the San Carlos which I think is easily worth $350,000 and the mortgage upon which is only $112,500.00, or else say the Valencia Apartments which are easily worth $225,000.00 and the mortgage upon which is only $80,000.00. In either event the equity would be more than equal to the sum of $100,000.00 which is the amount of protection Mr. Peters desires.

. "*Point* 14. I will be glad to have all insurance and bonds written by Companies in which Mr. Peters is interested, provided that should his Companies not be willing to write such insurance and bonds as I require he would be enabled to place the insurance and bonds elsewhere."

· The lessor wrote "I will take up first the question contained in points three and thirteen, inasmuch as these are the financial questions of the lease.

"Point No. 3. Mr. Rand can pay to me $15,000.00 cash on signing of the lease, $10,000.00 to you covering your commission making a total of $25,000.00. In addition to this he can give me ten notes of $5,000.00 each payable on the first of each month with interest at 8%, said notes to be secured by the lease, all of which will be placed in escrow in the bank until the notes are paid.

"Point No. 13. A second mortgage on the San Carlos property, corner Ave. B and 1st Street for $100,000.00 will be satisfactory in place of bond, provided I am allowed to collect and retain the rent on the property in this lease

until I have $50,000.00. Both second mortgage and cash to be held until Mr. Rand has completed $100,000.00 worth of building on this property at which time, the second mortgage on the San Carlos to be released and the $50,-000.00 to apply as a credit to Lessee on the rent at the rate of $5,000.00 each year, thereafter. It being understood, that any part remaining in the hands of Lessor will be forfeited in case the lease is forfeited.

"Point No. 8. This simply provides for future legislature which would protect me in case we have some fanatic legislation giving title to the property to Lessee on long time leases. I know of no such legislation in prospect but on account of certain legislation during the last few years, it is hard to foretell what may happen in this line and in case such legislation becomes effective this clause provides that Mr. Rand as lessee of this property will take whatever steps that are necessary to protect me in my title against such legislation. It would not effect his lease in any way because conditions arising as stated could be covered.

Point No. 12. I am satisfied it can be mutually arranged and that it is the general practice, on long time leases, that specifications and plans covering alterations or changes or improvements on the property be submitted and approved by lessor.

"Point No. 14. It will be necessary that all bonds and insurance be written on companies which we hold the agency for and I am satisfied that we can write any bond in reason that Mr. Rand will require.

"If these conditions are all satisfactory to Mr. Rand and he wishes the exercise of the option as stated at the beginning of my list, dated May 17th, we can give this matter to the attorney at once for preparation."

The lessee replied "It seems to me all of Mr. Peters' suggestions are satisfactory except Point 13.

"I am perfectly ready to give the $100,000.00 mortgage upon the San Carlos property and which would guarantee Mr. Peters until I spent $100,000.00 in improvements upon the property but I do not see how I could consent to have the rental from the property tied up, as frankly I will need every dollar of this rent and every dollar of rent from my other properties to carry my interest and to meet the notes to Mr. Peters and to help me build a building on the Halcyon Hotel property. I am in earnest about this thing and if Mr. Peters and I get together I am going to put a building on the property that he will be proud of and that will be better security than anything I could give him, but I must not tie my hands before hand in any way which would handicap me, and the taking of these rents from the San Carlos, which amount between thirty and forty thousand dollars per year out of my pocket at this time would make it very difficult for me to carry out my plans. I know if Mr. Peters considers the matter carefully he will see my position.

"I am ready to do this, however, to show Mr. Peters my willingness to protect his interests in every way. I will give the $100,000.00 mortgage as stated to be held by Mr. Peters until I have expended $100,000.00 in improvements upon the property. At that time the mortgage can be released and I will then do one of two things:

"(a)   Give a $50,000.00 Fidelity Bond to Mr. Peters.

"(b)   Increase the value of the improvements upon the property from $100,000.00 to $150,000.00."

The lessor wrote: "Replying to Mr. Rand's letter dated May 21st, in reply to my letter of same date relative to point No. 13, as set forth relative to deal pending.

"I don't think Mr. Rand could object to the terms mentioned when my letter of the 21st is understood. I did not refer to rents coming from the San Carlos as he states. The

$50,000.00 rent that I was to hold was the rent collected from the property I am leasing to him and would not affect his present assets in any way.

"I think this will be agreeable to Mr. Rand, inasmuch as it is the only point on which we have not practically agreed and, inasmuch as, I have not required him to make the first and last payment cash, which as you know, is customary, and have agreed to string out the first payment in such a way that he can make it without inconvenience to himself financially.

"I think this is as much as Mr. Rand could ask in taking over a large deal."

The lessee replied: "I have before me Mr. Peters' letter to you of the 23rd inst. The misunderstanding as to collection of rents was entirely due to my error as I misread Mr. Peters' letter. I now see that he refers to rents upon the Halcyon property and not the San Carlos, but the result so far as I am concerned would really be the same for I had counted upon the rentals of both properties in order to enable me to pay the rental and complete my improvements.

"I am sincere in wanting this property however, and at the same time I can readily see how Mr. Peters looks at the matter and I have this suggestion to offer. If Mr. Peters will extend the time in which for me to build from twelve months to eighteen months I will be willing for him to collect the first $50,000 of rents accruing on the Halcyon Hotel property provided fifty per cent thereof as collected be applied upon my notes which will be left in escrow with the lease, and the remaining fifty per cent amounting in the end to $25,000 be applied as the rate of $5,000.00 per year upon the first five years rent. I would expect to be allowed eight per cent on this $25,000 for the period that it

166       SUPREME COURT OF FLORIDA.

Hotel Halcyon et al. v. Miami Real Estate Co.—Opinion of Court.

was paid in advance as I would have to borrow money at this rate in lieu of it with which to build my building.''

The lessor made the following notation:

''Peters

| | |
|---|---|
| Guarantee Bond | $50,000 |
| I hold out of Halcyon rents | $25,000 |

To be returned in 3 yearly payments of $8,333.33 each beginning after the 100,000 improvements are completed.

5-24-21''

The lessee replied: ''I have considered Mr. Peters' pencil notation of May 24th as follows:

| | |
|---|---|
| 'Guaranty bond | $50,000.00 |
| Hold out of Halcyon rents | 25,000.00 |

To be returned in three yearly payments of $8,333.33 each beginning after $100,000.00 improvements are completed.'

''My understanding of your explanation of above notation and of your conference with Mr. Peters is that Mr. Peters will collect first $50,000.00 of rents out of Halcyon property after the execution of the lease to me, which he will hold until such time as I complete improvements on the property of the value of $100,000.00 when I shall have the privilege of giving him a guaranty bond for $50,000.00 and he will then return to me $25,000.00 in cash of the $50,000.00 collected by him and apply the remaining $25,-000.00 annually in three equal payments of $8,333.33 each upon the quarterly installments of the next three years rental.

The above is satisfactory to me and I think Mr. Peters and I now clearly understand each other and I herewith enclose you check for $15,000.00 being cash payment required by Mr. Peters on account of the lease which you are authorized to deliver to Mr. Peters and to close the transaction.

"There is no hurry about the drafting of the lease. It can be executed whenever Mr. Carson prepares same. I would suggest that it be dated as of June first, but if Mr. Peters prefers it date it today. That is agreeable to me. It will be easier, however, to adjust the rentals, etc., as of June first and will probably simplify the transaction.

"I would like the first $5,000.00 note to be made payable August 1st and thereafter monthly.

"The lease is to be made to my corporation and will be signed by me as President. I will execute the notes at the time of the signing of the lease, and the notes and lease can be placed in escrow, as Mr. Peters suggests.

"I would prefer either the Southern Bank & Trust Company or the Bank of Bay Biscayne if either of these institutions are satisfactory to Mr. Peters.

"I know Mr. Peters will be entirely reasonable about the $50,000.00 guaranty bond which I am to give in order to secure the release of the $50,000.00 cash he will have collected, and that he will waive this bond later on if I put additional improvements on the property amounting to $50,000.00.

"I understand from you that the second mortgage on the San Carlos property will not be required on account of retaining the $50,000.00 cash, and that Mr. Peters will consent to extending the time in which to complete the improvements from twelve months to eighteen months if I find that by rushing the work the lease on the hotel property will be jeopardized. I am ready to leave the leasing of the hotel to Mr. Peters."

The lessor wrote May 26, 1921: "I have Mr. Rand's letter to you of even date. The only changes that I can see at this time are as follows:

"When Mr. Rand has made improvements on the property to the value of one hundred thousand dollars, has given me the fifty thousand dollar guarantee bond and I

have paid him the first twenty-five thousand dollars return of rents collected, then the first payment of $8,333.33 will become due in twelve months from that date, the second payment of like amount in two years and the third payment of like amount in three years.

"The fifty thousand dollar guarantee bond to remain for twelve years from date of lease or until the twelfth yearly payment of rent has been paid.

"There are no other necessities for delay that I see as I understand Mr. Rand agrees to the other points at issue in this matter."

The lessee replied May 26, 1921: "I hereby accept the conditions with regard to repayment of $50,000.00 rent to be collected by Mr. Peters on the Halcyon property and with regard to the duration of the $50,000.00 guaranty bond, as per Mr. Peters' letter to you of this date, and you are authorized to close the transaction."

Other exhibits are:

"Copy.
Taxes on this property to be
prorated as of this date.

"Mr. J. W. Wallace,
       City.

Dear Sir:—

In view of the 99 year lease just closed with Mr. Rand, I will take the South 50 feet of lot 1, block 116-N, City of Miami, joining Townley property on Ave. C, as per pencil memorandum viz: 15,000.00 cash, assume mtge $45,500.00 and credit Hotel Halcyon lease $42,500.00. Ck $1,000.00 enclosed.

(Signed)    Thos. J. Peters

"Note.    This memo is not dated—delivered May 26th, 1921."

"May 26, 1921.

"RECEIVED of Thomas J. Peters, $1,000.00 as part payment on South 50 feet of Lot 1 Block 116 North of the City of Miami as per memorandum of this date as follows:

"Consideration $103,000.00 to be paid as follows:

"$15,000.00 cash.

"$45,500.00 mortgages on the property to be assumed by you,

"$42,500.00 credited on Hotel Halcyon lease covering the first eight and one-half months of said lease,

"$1,000.00 of said cash payment being acknowledged as received.

"Taxes on the property to be pro rated as of this date.

"F. H. RAND, JR.

"By C. L. Huddleton,

Atty."

The declaration alleges: "That the terms and conditions of said contract and agreement for said 99 year lease were duly and fully accepted by the complainant and by the defendant, respectively through their duly authorized and empowered officers and agents, and thereupon and in pursuance thereof, as part of same, on the 26th day of May, 1921, the complainant paid to the defendant the sum of Fifteen Thousand Dollars ($15,000.00) as the cash payment stipulated to be made by the complainant lessee to the defendant lessor on account of rental for the first year of said 99 year lease, and said payment was so received by said defendant lessor and the full amount thereof duly, in accordance with contract, applied by the defendant upon the rental for said first years period of said 99 year lease, and said amount is still retained by said defendant."

All the facts that are well pleaded are admitted by the general demurrers to the bill of complaint.

The essential elements of an ordinary short term lease of real estate were definitely agreed upon and in addition thereto the subsidiary covenants that were mentioned by the parties as essential to the long term lease contemplated, were considered and agreed upon; a portion of the first year's rent was paid and another portion of it arranged for to the satisfaction of both parties. These conditions taken with other pertinent circumstances in the negotiations between the parties, afford an equity for an enforced execution of the lease, even though other incidental provisions, such as those contained in the proposed written lease that was offered by the lessor and rejected by the lessee may be expedient for the mutual protection of the parties to a 99 year lease. It is apparent that such other or incidental provisions were not regarded by the parties as being necessary in the negotiations for the 99 year lease, and consequently in enumerating the terms to be agreed on, they were not made essential elements of the contract to lease that is here sought to be enforced. All the terms that the parties themselves considered essential to the contemplated lease having been agreed on, the law requires no more, and the equities appear to be with the complainant lessee, therefore the demurrers to the bill of complaint were properly overruled. Florida Yacht Club v. Renfroe, 67 Fla. 154, 64 South. Rep. 742. This case is essentially different from Daubmyre v. Hunter, 86 Fla. 326, 98 South. Rep. 69.

Affirmed.

TAYLOR, C. J., AND BROWNE, WEST AND TERRELL, J. J., concur.

ELLIS, J., dissents.

ELLIS, J., dissenting.

This is an appeal by Hotel Halcyon Corporation and Thomas J. Peters from orders overruling joint and several general and special demurrers of the above named parties to a bill of complaint exhibited by Miami Real Estate Company against them and H. S. Duncan, J. Salzillo, Miami Land and Fruit Company, Havana-American Steamship Company, H. Curran, Mutual Investment and Savings Company, H. Bowman, C. C. Matlack, J. F. Lofton, J. B. Thomas, George Nackly, Andrew Mangos, Rosa LeForte, Dr. Charles N. Webster and ———— Powers, all being residents and citizens of Miami, Florida.

The litigation involves the property in Miami known as the Hotel Halcyon property and those named as defendants, other than the Hotel Company and T. J. Peters, are tenants of the Hotel Company and occupying different parts of the building and attorning as tenants to that company.

The complainant seeks the specific performance of an alleged contract for a lease to cover a period of ninety-nine years and special relief incident thereto; for an accounting from the Hotel corporation of the rentals received by it or accruing to it since June, 1921; for an injunction restraining the sale or leasing of the property to others, or the sale of any leases that may be held upon any part of it; for the appointment of a receiver and general relief.

The bill alleges that in May, 1921, the Hotel corporation owned the property, that T. J. Peters was president of the corporation and J. W. Wallace its duly authorized agent. That Frederick H. Rand, Jr., was president of the complainant corporation, who acted for it in the matters alleged, and these facts were known to all the parties.

It was alleged that the complainant corporation and the Hotel corporation, through their agents, entered into a con-

tract under which the Hotel corporation agreed to execute to the complainant a ninety-nine year lease of the Hotel property, with appurtenances, tenements and hereditaments thereunto pertaining, from June 1, 1921. That the lease was to be in writing, the consideration therefor to be the payment of certain rentals during the term. That the lease was to contain certain provisions specifically set forth in the bill. They are lettered from (a) to (p) inclusive.

The paragraph lettered (a) deals with the amount of rental to be paid each year during the term of the lease; (b) with the payment of the rental for the first year; (c) with the payment of the annual rent after the first year; (d) with the payment of taxes by the lessee; (e) with the payment of income or other Government tax by the lessee on account of improvements; (f) with the carrying of fire insurance by the lessee; (g) with a provision to be incorporated in the lease securing an option to the complainant at any time within ten years to purchase the property clear of all incumbrances for the sum of $2,000,000.00; (h) with the matter of grace to be allowed on each payment of rent; (i) with the matter of repairs by the lessee and the giving of a bond by it guaranteeing the construction of other buildings of equal value in place of those that might be torn down in alterations and repairs of the property; (j) with the giving of a bond by the lessee before beginning new buildings or improvements to cover liens or other obligations incurred on account of labor or material; (k) with a provision to require new buildings or improvements to be made by the lessee amounting to not less than $100,000 within eighteen months; (l) with a provision to require the lessee to submit plans and specifications of such proposed alterations and to be approved by the lessor before the work should commence; (m) with a provision requiring all policies of insurance and bonds to be given in "old line companies" represented by Newman and Peters; (n) with

a provision that the lessor would collect the first $50,000.00 of rent from sundry third persons accruing out of the Hotel property after June 1, 1921, and should hold the same until the lessee should complete improvements to the value of $100,000.00, at which time the lessee should have the privilege of giving a bond in the sum of $50,000.00 guaranteeing the performance of the lease, thereupon the lessor would return $25,000.00 with interest and apply the remaining $25,000.00 as a credit annually, in three equal amounts, upon the first quarterly installment of rent due under the lease during "the next three years thereafter" and the time when such application should be made, and the time during which the bond for $50,000.00 should continue in force; (o) with a provision that the lessor should retain "all right and title to the property" during the term with full right to mortgage or sell the same subject to the rights of the lessee and (p) with a provision that the lessee should assume the lessor's obligations under all leases previously made of the property and in existence on May 26, 1921," (as per list thereof upon said date furnished by the defendant, Hotel Halcyon Corporation, to the complainant herein.)"

The bill alleges that pursuant to the agreement the complainant paid to the "defendant" $15,000.00 on May 26, 1921, on account of the rental of the property under the terms of the proposed lease.

That on the 13th day of May, 1921, the complainant was the owner of a certain lot of land located north of Miami and that it was agreed between the parties that "certain of the monthly installments of first year's rental under said '99-year lease' represented by the ten promissory notes in the sum of $5,000.00 each aforesaid (which were to be placed in escrow in bank with said duly executed '99-year lease' should be liquidated and paid by the lessee in the following manner, to-wit: that the said defendant Hotel

174        SUPREME COURT OF FLORIDA.

Hotel Halcyon et al. v. Miami Real Estate Co.—Dissenting Opinion.

Halcyon Corporation, or its president, for it should and would purchase of and from said complainant "the lot referred to," at and for a consideration and purchase price of $103,000.00, to be paid by said defendant or its president, as follows:

$15,000.00 cash,

$45,000.00 by the assumption of certain mortgages then encumbering said property.

$42,500.00 by a credit upon the first year's rental of said '99-year lease,' said credit, it being understood, liquidating and settling the first 8½ monthly installments in the sum of $5,000.00 each, representing by notes aforesaid."

That $1,000.00 had been paid by the "corporation or its president, as a deposit, on account of the purchase of the property." That the complainant has been at all times ready, willing and able to convey the property under the terms of the agreement.

It is then alleged that the contract for the lease is "contained and included in certain written letters, instruments and memoranda passing between complainant lessee, represented by Frederick H. Rand, Jr., and defendant lessor, represented by said Thos. J. Peters, its president, and said J. W. Wallace, its agent in said transaction."

Copies of such letters, instruments and memoranda "constituting said contract and agreement, marked Exhibits 3 to 17, inclusive" are attached to the bill and reference to them is "prayed as if fully set out" in the bill.

It is alleged that no specific time was agreed upon by the parties within which the lease should be executed. That the Hotel corporation was to have prepared and submitted it to the complainant through Frederic H. Rand, Jr., its president, for examination, approval and execution in behalf of the complainant. That it was to bear date and be effective from June 1, 1921.

It is also alleged that T. J. Peters should have charge of the leasing of the Hotel Halcyon for the tourist seasons of 1921 and 1922 for the benefit of the complainant, subject to its approval. That throughout the negotiation the defendant knew that Frederic H. Rand, Jr., would soon leave Florida for New York and thence to Europe for a "few months." That between May 27 and June 9, 1921, he was in either Orlando, Florida, or New York City and on the latter date sailed for Europe. That at all times between May 27, 1921, and the date of the filing of the bill, which was December 12, 1921, the address of Mr. Rand was available to the defendant who could have submitted to him by registered mail the "99-year lease."

That on June 29, 1921, the defendant prepared a lease, and forwarded it to Mr. Rand in Paris, France, on June 30, 1921, that it was received by him between July 22 and August 1, 1921. That the draft of the lease was not in accordance with the contract and was rejected by the complainant and duly returned to the defendant corporation with the request that it be redrafted in accordance with the contract. A copy of the lease, so prepared, is attached to the bill as Exhibit "18" and made a part of it.

Paragraph XIV of the bill deals with alleged "Unwarranted Conditions" contained in the draft of the lease which was rejected by the complainant. These alleged unwarranted conditions are set out in the bill under subdivisions of the paragraph XIV and lettered from (a) to (z) inclusive. Two alleged "Omissions" are made the subject of paragraph XV and lettered (a) and (b).

These, or some of them, will be more particularly referred to later in this opinion.

It is alleged that the defendant has refused to execute a lease in conformity with the contract but the complainant has tendered to the defendant the total sum of the first year's rental and defendant has refused to accept the same.

That on July 30, 1921, Mr. Peters cabled Mr. Rand at Paris that if the lease was not delivered to Mr. Peters "properly executed by August tenth will withdraw proposition."

There are other allegations concerning matters affording the basis for incidental relief which are unnecessary to mention.

There are forty-seven grounds given in the general demurrer. They may be classified under a few propositions attacking the equity of the bill. First it is asserted that the bill is multifarious and duplicitous and there is a misjoinder of parties.

There is no merit in these propositions. The tenants of the Halcyon corporation, who occupy portions of the premises under leases from that Company, were not necessary parties because their rights are not so connected with the claims of the principal litigants as that no decree affecting the latter could be made without impairing the rights of the former, but they were proper parties because not being interested in the controversy between the immediate litigants their interest in the subject matter can be conveniently settled in the suit. While as to Mr. Peters it is alleged that the defendant corporation, through him, should lease the hotel for the ensuing tourist season for the complainant.

There are not several causes of action united in the one bill, unless it may be said that the alleged agreement of the defendant to purchase the complainant's land and apply the price upon the yearly rental of the Hotel property under the lease was a separate transaction and the subject of independent litigation, but that is not wholly true, as that alleged agreement grew out of and was a part of the main controversy and affects only a part of the consideration to be paid by the complainant so that the principal defendants are interested in the same rights so far as that collateral agreement, if it may be called such, is concerned.

See Farrell v. Forest Inv. Co., 73 Fla. 191, 74 South. Rep. 216.

Second, as to the remedy, it is contended that an agreement for the execution of a formal lease, which is to be subject to approval by the parties, cannot be specifically enforced. That the remedy is at law against Mr. Peters for the breach of the alleged contract.

This proposition is not sound because it is alleged that there was a written agreement consisting of letters and telegrams exchanged between the parties which complies with the conditions of our statute of frauds. See Sec. 3872, Revised General Statutes, 1920.

Specific performance of a lessee's agreement to take a lease has been decreed in England. See Soames v. Edge, 70 Eng. Rep. (Full Reprint) 588; Shepheard v. Walker, L. R. 20 Eq. Cas. 659; Pym v. Blackburn, 3 Vesey Jr's Rep. 34; Kay v. Johnson, 2 Hem. & M. 118, 71 Eng. Rep. (Full Reprint) 406; 16 R. C. L. 557.

The contract alleged in the bill is alleged to be contained in several writings. Contracts required to be in writing may be so evidenced. See Howard v. Pensacola & A. R. Co., 24 Fla. 560, 5 South. Rep. 356; Harvey v. Hayes, 71 Fla. 346, 71 South. Rep. 282; Felt v. Morse, 80 Fla. 154, 85 South. Rep. 656; 1 Underhill on Landlord and Tenant, 268; Wharton v. Stoutenburgh, 35 N. J. Eq. 266; Cochrane v. Justice Mining Co., 16 Col. 415, 26 Pac. Rep. 780.

As to the agency of Peters and Wallace for the Halcyon corporation and Rand for the complainant the allegations of the bill are specific and clear and for the purposes of the demurrer admitted by the defendants.

As to the prayer for a receiver and an injunction that relief is incidental.

Third, it is contended that the bill affirmatively shows negligence by the complainant in that it was guilty of unreasonable delays in not securing the execution of the lease

and offering to perform the conditions on its part to be performed.

We think there is no merit in this contention. The bill alleges that the negotiations occurred between May 13 and 26, 1921, and on the last named date the complainant paid to the defendants $15,000.00 which was the first and only payment to be made on or before the execution of the lease. According to the allegations of the bill the defendant was to prepare the lease which was to contain the terms agreed upon but it has failed to do that, yet the complainant has made written demand upon it to do so and tendered the total sum. in advance of the first year's rental and the defendant has refused to accept it. The bill was filed on December 13th of the same year praying for specific performance of the agreement. We do not perceive in this any lack of diligence on the complainant's part to assert its claim.

In Knox v. Spratt, 22 Fla. 64, 6 South. Rep. 924, the delay was two years and seven months. In Hathcock v. Societe Anonyme La Floridienne, 54 Fla. 631, 45 South. Rep. 481, the delay was three years. In Asia v. Hiser, 38 Fla. 71, 2 South. Rep. 796, the appellant had failed to make his payments upon the land; according to the agreement, demands had been made upon him for such payments and notice given that the vendor would rescind the agreement if the payments were not made. The appellant even agreed to such notice and this delay and failure on appellant's part continued through a period of years.

Fourth, it is contended that the correspondence between the parties constituted only negotiations for an option to lease which was never accepted by the complainant.

This phase of the attack upon the bill is without merit in so far, at least, as it is urged that the correspondence merely shows an offer by the defendant to lease the property, which was not accepted by the complainant. The

VOL. 89, JANUARY TERM, 1925.     179

Hotel Halcyon et al. v. Miami Real Estate Co.—Dissenting Opinion.

proposition to lease was undoubtedly accepted by both parties but the particulars of the lease were matters of negotiation. The allegations of the bill are in effect that both complainant and defendant recognized the existence of an agreement for the execution of a lease and pursuant to that agreement the defendant prepared a lease and forwarded it to Mr. Rand for execution by the complainant corporation. The negotiations had passed beyond the stage in which an offer is made by one party but not accepted by the other. The parties had agreed to the execution of a lease and pursuant to such an agreement the complainant had paid a large sum of money to be applied upon the first year's rental, but the trouble is with the particular covenants which the lease was to contain.

The fifth proposition is that the alleged agreement is not sufficiently definite in its terms to be specifically enforced; that the correspondence between the parties attached to the bill as "Exhibits" shows that they had not agreed upon the terms of the lease and that the agreement was nothing more than one to execute a formal lease to contain such terms and conditions as the parties thereafter might approve.

It is undoubtedly true that for an agreement of the kind set up in the bill of complaint to be made the basis of a decree for specific performance it must be certain as to the terms of the intended lease. See Clinan v. Cooke, 15 Eng. Ruling Cases 343; 16 R. C. L. 558; Franks v. Hewitt, 56 App. Div. Rep. (N. Y.) 497.

Not only must the parties have agreed to every material matter to be incorporated in the formal lease but the words contained in the letters and memoranda constituting the evidence of such agreement should be so clear and unambiguous that the court may ascertain from them the terms to be included in the formal writing agreed to be executed. See Underhill on Landlord and Tenant, 268; Charlton v.

Columbia Real Estate Co., 67 N. J. Eq., 629, 60 Atl. Rep. 192, 69 L. R. A. 394, 3 Ann. Cas. 402.

In other words, the contract must be as certain, definite and full in every essential as to terms and conditions as the proposed formal instrument to be executed.   The difference between the two is the interest in the land, called an *interesse termini* which the lessee secures by the latter instrument and the character of obligation which each party incurs.

It is said to be often difficult to distinguish between a written lease and a writing which is merely an agreement to make a lease and that the distinction is important since the consequences of the breach of a lease are very different from the consequences of the breach of an agreement to make a lease.   See 1 Underhill on Landlord and Tenant, 246.

Now, an agreement for a lease may be made by correspondence but there must exist an intention in the minds of the parties to enter into a contract, "not merely to settle the terms of an agreement into which they propose to enter by a formal writing, after all the particulars are adjusted and by which alone they design to be bound."   See Holliday v. Pegram, 89 S. C. 73, 71 S. E. Rep. 367, Ann. Cas. 1913A 33.

In arriving at the intention of the parties it is essential to consider the circumstances as well as the language used by them in their correspondence.   The subject of this agreement was one of considerable magnitude not merely regarding the value of the property involved and the amount of the yearly rental, but the duration of the term to be created by the lease.   For a period of ninety-nine years the lessee and its successors were to have the possession of the property and pay to the lessor and its successors in title the annual rental.   In such an agreement there are always many more matters of detail to be made the subject of con-

## VOL. 89, JANUARY TERM, 1925. 181

Hotel Halcyon et al. v. Miami Real Estate Co.—Dissenting Opinion.

tract than are usually involved in an agreement to sell outright.

In the latter case a written memorandum, most meager in detail, will often suffice to constitute the basis for a decree for specific performance. If the matter of parties, consideration and description of property are sufficient that will suffice, because the law infers an agreement to convey a marketable title; but where a formal lease is to be executed not only these details but many others must be definitely settled before the minds of the contracting parties may be said to have met. There are, for instance, the matter of yearly rentals, when and how to be paid, security for payment; taxes of every nature and kind and by whom to be paid; repairs upon buildings, how and when to be made and by whom; new buildings, for what purpose erected and of what materials constructed and money to be expended therefor and approval of plans; insurance in what sums to be taken, for whose benefit and at whose expense; the use to which the buildings and property are to be subjected; provisions covering a breach of any of the covenants and what shall be the effect of any such breach upon the term; the lessee's right to the removal of improvements placed by him upon the premises during the term of the lease; conditions as to waiver of any breach of covenant and provisions as to subletting the premises.

Usually in such a lease these details, and others that may be mentioned, are made the subject of negotiations and are incorporated in the formal document. Each subject is itself a matter to be dealt with in detail and particularized with the accuracy and prudence of which the parties are capable.

In the case at bar these and other matters were the subject of agreement and settlement. There was the matter of furniture contained in the building, its use, insurance and restoration; the payment of the large yearly rental

seemed to have been definitely settled with the exception, however, of the complication introduced by the part payment thereof in land to be conveyed by the complainant to the defendant and the assumption by the latter of a large obligation resting upon it in the form of a mortgage.

An examination of the correspondence between these parties impresses me with the conviction that it was their purpose to enter into a formal contract of lease by the terms of which, as ultimately settled and incorporated in the instrument, they would be bound, and by their correspondence to tentatively settle the terms of the agreement into which they proposed to enter in the form of a formal lease.

The proposition to rent for a definite term of years to begin at a certain time and the rental to be paid had been made and accepted, but other essentials were left to settlement by correspondence.

We cannot say from the writings submitted that the parties agreed upon these details.

A decree directing the execution of a lease should not be made unless the court can say with certainty that the terms were definitely and clearly decided upon and agreed to by the parties.

The parties, themselves, have not given the correspondence between them a practical construction by agreeing upon a course of action consistent with the terms of their alleged agreement. The complainant was not let into possession of the premises nor have they seemed to agree upon some of the most essential matters discussed and to be included in the lease.

To justify specific performance, which is not a matter of right in the parties, the contract should be definite and its enforcement practical and equitable. See Maloy v. Boyett, 53 Fla. 956, 43 South. Rep. 243; L'Engle v. Overstreet, 61 Fla. 653, 55 South. Rep. 381.

VOL. 89, JANUARY TERM, 1925.    183

Hotel Halcyon et al. v. Miami Real Estate Co.—Application for Rehearing.

I do not agree with the proposition of appellee that the main features of the lease having been agreed upon between the parties that matters incidental thereto, or of minor importance in the estimation of the court, may be ignored or embraced in some covenant or provision of the lease which to the court may be deemed suitable, appropriate or adequate to protect the interests of the lessor.

The subject matter of this lease, as stated, was a property of much magnitude in point of value; the rentals were unusually large and there were many details and complex situations to be fully settled and agreed upon and incorporated in the lease to be executed, and only by which the parties intended to be bound. To vary these details, or substitute the court's ideas upon some apparently minor matter for what the parties agreed upon or left unsettled, is to write a contract for them and then direct its specific performance.

In this view of the case I think that the order overruling the demurrer was erroneous and should be reversed with directions to allow the complainant to amend its bill, if it so desires.

ON APPLICATION FOR REHEARING.

PER CURIAM.—The appeal herein is from orders overruling demurrers to the bill of complaint. An equity for specific performance is alleged and the orders overruling the demurrers were affirmed on this appeal.

It clearly appears that in the negotiations here involved the Halcyon Hotel Corporation was the contemplated lessor and the Miami Real Estate Company the contemplated lessee. Mr. Peters' letter of May 17, 1921, reserved "the right to withdraw the property entirely from this transaction if I wish to do so prior to signing the option." The same letter referred to an enclosure of "fourteen points that would need to be included in the lease," which points,

though referred to as "terms of option," were adjusted and agreed on as terms of the lease, the option proposition having been superseded by direct negotiations for a lease. By "Point No. 3" that was adjusted and agreed on, May 21st by two letters, it was agreed that in lieu of $10,000.00 for an option and $75,000.00 advance rental payment, the lessee was to pay $15,000.00 cash on signing of the lease, and $10,000.00 cash for commissions and ten notes of $5,-000.00 each, with interest, for the advance rental payment.

On May 26, 1921, Mr. Peters for the lessor wrote that "the only changes that I can see at this time are": stating them, and that "There are no other necessities for delay that I see as I understand Mr. Rand agrees to the other points at issue in this matter." On the same day the lessee wrote "I hereby accept the conditions  *   *   *  as per Mr. Peters' letter to you of this date, and you are authorized to close the transaction." The negotiations were concluded by the parties themselves.

On May 26, 1921, "in view of the 99 year lease just closed with Mr. Rand" a further agreed adjustment relative to advance payments by the lessee was made by an agreement of the lessor to buy and of the lessee to sell to the lessor a different piece of property for a consideration of $103,000.00, viz: "$15,000.00 cash, assume mortgage 45,500.00 and credit Hotel Halcyon on lease $42,500.00. Ck. $1,000.00 enclosed (Signed) Thos. J. Peters." Receipt of the "$1,000.00 as part payment on" the sale was acknowledged for the lessee.

The allegations of the declaration are of facts that comport with the writings that are made a part of the declaration by exhibits.

Rehearing denied.          .     -

WEST, C. J., AND WHITFIELD, BROWNE AND TERRELL, J. J., concur.